[S. F. No. 15661. In Bank.—December 31, 1936.]

FRANK ALES, as Administrator, etc., Appellant, v. FRED S. RYAN, Respondent.

R. V. Bressani, David M. Burnett and John M. Burnett for Appellant.

Bohnett, Hill & Campbell, L. H. Schellbach, D. T. Jenkins and Frank V. Campbell for Respondent.

Hartley F. Peart, Horace W. B. Smith, Redman, Alexander & Bacon, Conley, Conley & Conley, Neumiller & Ditz, Gerald M. Desmond, Geary & Geary and C. G. Tauzer as *Amici Curiae* on Behalf of Respondent.

SEAWELL, J.—This appeal is from a judgment rendered against plaintiff, as the administrator of the estate of Rose Carauddo, deceased, and in favor of defendant, Dr. Fred S. Ryan. The action originally included as defendant the members of the board of supervisors of Santa Clara County in their individual and official capacities, and Dr. Doxey R. Wilson, medical director of the Santa Clara County Hospital. The demurrer filed by the members of the board of super-

visors was sustained without leave to amend. Dr. Wilson was dropped from the action on motion for nonsuit and it went to judgment with Dr. Ryan as the sole defendant. The complaint alleges general negligence. The evidence discloses the fact that on April 30, 1929, at the Santa Clara County Hospital, city of San Jose, Mrs. Rose Carauddo was operated on by defendant, Dr. Fred S. Ryan, for the purpose of having her gall bladder removed. It is the allegation of the complaint that he negligently closed the incision without removing from the cavity of the abdomen a large laparotomy sponge which he had used in performing said operation. Mrs. Carauddo was a widow, thirty-four years of age, in apparently robust health, and the mother of two minor children of the ages of nine and eleven years, respectively. During the fruit season she worked in the fruit canneries, and when the season was over she worked as a seamstress. She died September 1st, four months after said operation, from peritoneal infection, following a second operation performed on her abdomen on August 31, 1929, by Dr. Bartholomew Gatuccio at the San Jose Hospital, by which said sponge was removed.

Dr. Ryan performed the gall bladder operation at the Santa Clara County Hospital upon the request of Dr. Doxey R. Wilson, medical director and supervisor of said county hospital, Dr. Wilson being, at the time, incapacitated by reason of an infection of the hands.

Dr. Ryan was a member of the surgical staff of said county hospital without pay, and was frequently engaged in performing operations at the institution. His qualifications as a surgeon are not questioned. In fact, it is not claimed that the death of Mrs. Carauddo was caused by lack of medical or surgical skill on the part of the surgeon, but it is claimed that he did not exercise that degree of care which is reasonably commensurate with the kind of act he undertook to perform. Plaintiff contends with much force that no medical skill is required in the determination of self-evident facts such as whether the inclosing of a laparotomy sponge in the abdominal cavity of a patient by the operating surgeon does or does not constitute negligence.

The use of the word "sponge" is somewhat misleading to the layman, inasmuch as said material referred to as a sponge is not in fact the marine growth, but a pack made

of gauze material consisting of several layers. The smaller ones are used to absorb accumulations of blood, as well as to staunch its flow. The small arteries and blood vessels are ligated by the use of forceps or haemostats, and the large laparotomy sponges, which are described as being "quilted" in form, are used in walling off the intestines from the field of operation, and in holding the intestines in place. The tendency of the bowels, according to the medical testimony, in cases where the patient does not come entirely under the influence of the ether, is to convolute in the direction of the incision, and said larger sponges are used to tuck in the bowels and hold them in place.

After the operation Dr. Ryan never again saw Mrs. Carauddo. Four months after he operated on her she was examined by Dr. Bartholomew Gatuccio at the San Jose Hospital. She was suffering much pain and he observed a mass on the right side of her upper abdomen under the scar of the incision made by Dr. Ryan. In performing a laparotomy operation, he observed a considerable amount of pus under the skin and a small sinus or opening leading into the abdominal cavity. Pus was draining from the opening. In making the incision larger, he discovered the gauze sponge, 14 by 14 inches. It lay directly over the space occupied by the gall bladder and was rusty in color and was covered with fiber. He observed a number of abscesses in the abdominal wall and considerable pus in the region of the body where the sponge was found. She died the next day from peritoneal infection.

It is conceded that Dr. Ryan was in absolute control of the operation, assisted by Dr. T. F. Ayers, an interne in said institution. The latter's duty was to assist in keeping the field of operation open by banking off the intestines. He testified that two dozen artery haemostats were used to close arteries. These appliances are in the nature of clamps. A large number of small sponges were used, but a much lesser number of the larger type were used. Both Dr. Ryan and Dr. Ayers used sponges during the operation, which continued throughout a period of approximately two hours, but neither kept any count as to the number of sponges that were placed in the cavity, nor was there any kind of safety appliance, such as metal rings or sponge haemostats, attached to the sponges. A haemostat is a soft metal clasp

approximately five inches long designed for attachment to the patient's garment, while the rings referred to are metal. Both are attached to the sponges by strings or band connections and the opposite end may, in case of haemostats, either be made fast to the robes of the patient by clamps or may be permitted to hang unattached by the side of the body. The purpose, of course, is to minimize the hazard of closing abdominal incisions without having first removed all gauze pads placed by the surgeon or his assistant in the cavity in the course of the operation. These metal appliances have a further value. If by any chance a sponge should be overlooked and the incision closed without its removal the metal ring or haemostat would show or register in the X-ray photograph, whereas a sponge with no such metallic appendage would furnish no evidence that a foreign substance was seriously impairing the patient's health.

Dr. F. R. Anderson was the anaesthetist, but he took no part in the operation other than to administer the anaesthetic, and apparently he was not professionally concerned with the methods employed by the operators. The others who were present and rendered assistance to the operator were two nurses, Miss Helen Vortman and Miss Clarisse Frost. The former is a graduate nurse and an instructor of nurses at the hospital, but she was not present during the whole of the operation. She was in and out during its progress and consequently was not able to furnish much information concerning it. She did not count the number of sponges used. She could not remember that a sponge count was requested by anyone and did not know anything about a sponge count, if any was made. She was not able to say she was present during the closing period of the operation. The latter, Clarisse Frost, had had a year and a half of experience at the hospital. It was the first time she had been in an operating room to attend an operation of any kind. At the trial she was unable to give the number of sponges used in the operation. Miss Frost explained that the sponges were brought into the operating room in packages and piled on a table. Neither Miss Frost nor Miss Vortman counted the number that were brought into the operating room or the number that were used and thrown into the receptacle after use. No one testified or claimed to have independent knowledge as to any check

having been made with respect to the number used and discarded and the number of unused sponges remaining in the original pile. Miss Frost said she did not count the sponges used in the operation. Miss Vortman said she did not count them. The doctor in charge of the operation and his assistant testified that they gave no heed to the number of sponges used, both claiming that keeping count of the sponges used is strictly the duty of the attending nurses. The physician who administered the anaesthetic kept no count. Notwithstanding the fact that each person who was in any way connected with the operation disclaimed making a sponge count or having any positive knowledge that any was kept, two or three, including Dr. Ryan, the operator, testified that the announcement was made that the sponge count was correct. Dr. Ryan testified that as the announcement was made (presumably by a nurse), he viewed the field of operation and seeing no sponges closed the incision. Dr. Ayers said he and Dr. Ryan "looked around at the sponges that we had used, as in every other operation, and not finding any sponges we asked the nurses . . . if the sponge count was correct and they said it was and then we went about to close up the incision." Dr. Anderson testified that Dr. Ryan asked the nurses, just before closing the incision, if the sponge count was correct and "one (nurse) asked the other one and they both replied that it was correct". This took place in the presence of the operators. The above circumstance, he explained, was impressed upon him for the reason that he was acquainted with Miss Frost, she had been his patient, and it was "her first major surgical case as a scrubbed-up nurse". Miss Frost said it was the first time she had been in attendance upon an operation of any kind.

It is very clear from Miss Frost's testimony that she had no definite idea as to the number of sponges that were used. Her testimony on the whole matter is so vague and unsatisfactory as to render it negligible. She did, however, say she was positive that somebody announced that the count was correct, notwithstanding her inability to state the number of sponges used or to name the person who made the count. No record of any kind, if any was made, was offered in evidence or referred to. We have heretofore

made reference to the testimony of Miss Vortman on this subject.

All of the persons, including nurses, who took any part in the operation were under the control of and subject to the orders of Dr. Ryan, but were employees of the county hospital, maintained by the county of Santa Clara for the care and treatment of the indigent sick and dependent poor. The sponges, surgical instruments and appliances used in the operation were the property of and furnished by said county hospital.

■ It is one of the contentions of respondents, and testimony was adduced tending to support it, that it is proper practice in cases where a surgeon performs an operation and is assisted by accredited nurses, that he may rely absolutely and solely upon the count and report of the nurses working under him as to whether all the sponges used in the operation have been properly accounted for, and that if such report or count should thereafter prove incorrect and if as a consequence of the error a sponge should be sewed up in the abdominal cavity, the surgeon would be exempt from damages for the injury suffered by the patient, without any regard to the circumstances or the nature of the operation, its duration, the number of sponges used, the likelihood of sponges escaping the eye by a mere casual inspection of the exposed surface of the intestines, or without regard to the danger of concealment in the crevices of the abdomen. In other words, so far as the surgeon is concerned, the nurses' count is to be accepted unhesitatingly and without question and no account is to be taken of the likelihood that a distraught nerve condition may have been suffered by the nurse by reason of the many exacting duties rapidly performed in the stress and excitement of a major operation which may well tend to produce uncertainty in the nurse's mind as to the number of sponges used in the operation. A manifest condition of uncertainty, from some cause, is actually shown to have existed in the nurse's mind at the time the count was announced, by the testimony of the acting nurse herself. Whether it was sufficient to have put the surgeon on notice was a question for the jury. The reliability of the nurse's count in order to justify a surgeon in safely acting upon it (assuming that in some unusual cases he may be justified in doing so) must be determined in each

particular case upon the basis of the qualifications and efficiency of the nurse and the care and attention which she has exhibited in the performance of her duties which are performed in the immediate presence of the operating surgeon and which are at all times subject to his supervision and control. If he elects to close up an abdominal incision, relying solely on the count of the nurse, he must show that he was justified in doing so in the light of all the circumstances attending the operation, which is a question for the jury's determination.

It is respondent's contention that the *res ipsa loquitur* doctrine or rule had no application to the case, inasmuch as the pleading was not in form a general allegation of negligence but that the pleader undertook to describe the particular manner in which the alleged negligence was committed. The complaint alleges that the operation was performed for the purpose of removing a gall stone and that said operation was negligently and carelessly performed, in that said operators carelessly and negligently "left within the abdomen of said Rose Carauddo a large laparotomy sponge and that after the gall bladder of said Rose Carauddo was removed the incision made therefor was sewed up without removing said sponge", as a result of which she died. There was no attempt on the part of the pleader to allege specific acts. Precisely the same question was presented to the District Court of Appeal, Third Appellate District, in the case of *Armstrong* v. *Wallace*, 8 Cal. App. (2d) 429 [47 Pac. (2d) 740]. The allegation which received the attention of the court was that the defendant, Dr. Wallace, "negligently and carelessly deposited and left an abdominal sponge or gauze pad within the abdomen of said Maxine Armstrong". The answer to the argument made in the instant case is to be found in the Armstrong case, wherein it was said that the complaint did not in effect allege specific acts of negligence, but at most merely charged that appellant negligently left a sponge in the abdomen of plaintiff and closed the incision without removing the sponge. No attempt was made to describe the negligence in detail nor charge why or under what circumstances it occurred. It would be impossible to state a cause of action arising from the acts complained of in fewer words than are used in the allegations of the instant case. The court held that the complaint

in the cited case was couched in general terms and that it was not in such form as to prevent the application of the doctrine of *res ipsa loquitur*. *Dimock* v. *Miller*, 202 Cal. 668 [262 Pac. 311], also directly supports the claim of appellant that the allegations of the complaint are general and the jury was entitled to consider the fact that none of the sponges had any kind of safety appliance or attachment.

Whether or not the rule that the pleading of specific acts of negligence absolutely deprives the pleader of the right to rely upon the *res ipsa loquitur* doctrine applies, or whether the rule of those cases which hold ''that where plaintiff makes specific allegations of negligence he must rely for his recovery upon, and he is limited to such specific acts of negligence and cannot recover for any other negligent act but he is not deprived of the benefit of the doctrine of *res ipsa loquitur* so far as those specific acts of negligence are concerned'', is applicable are questions not involved in the instant case. We have held upon ample authority that the allegations of the complaint herein are general in form and substance and the rule as to specific acts óf negligence has no application to the issue. The proof which may be made in cases where general negligence is alleged is well illustrated in *Carnahan* v. *Motor Transit Co.*, 65 Cal. App. 402 [224 Pac. 143], Curtis, J., writing the opinion, in which it is said: ''It is well settled in this state that negligence may be pleaded in general terms [citing cases]. The effect of this rule . . . is to make admissible in evidence any and all testimony which would tend to prove this allegation of negligence.'' A number of examples are given in illustration of the application of the doctrine which makes it plain that the last instruction, No. 46, given by the court in the instant case clearly constituted prejudicial error and took from the jury the right to consider a material element as to whether respondents were chargeable with negligence by reason of having used sponges without any kind of safety appliances or attachments in the circumstances of the operation as shown by the evidence. The instruction follows:

''The plaintiff in this action is limited to the allegation of negligence which he makes in his complaint. He can recover on no other ground. The only charge is that the defendants negligently left a sponge in the abdomen of Rose Carauddo.

There is no claim that defendants were unskillful or that they negligently used any improper kind or type of sponge, or that an improper kind or type of sponge was used, or of using an improper sponge, or one not provided with rings or haemostats." We are of the view that the above instruction constitutes reversible error.

Proof of the closing of the incision with a sponge left in the abdomen calls for an explanation by the defendant, in the absence of which a finding of negligence may be made predicated on an inference which may be sufficient to support the finding. (*Mansfield* v. *Pickwick Stages, N. D., Inc.*, 68 Cal. App. 507 [229 Pac. 890], by Langdon, J.; *Armstrong* v. *Wallace, supra; Brown* v. *Shortlidge*, 98 Cal. App. 352 [277 Pac. 134].) The questions as to how and why the sponge was left in the abdomen, and its fitness for and adaptability to the purpose for which it was used in the operation, are relevant to the issue of negligence which is the crux of the action. In *Michener* v. *Hutton*, 203 Cal. 604 [265 Pac. 238, 59 A. L. R. 480], the subjects to which the doctrine of *res ipsa loquitur* may be applied are firmly established. It is there said:

"The courts of this state have long since adopted the rule as expressed in 1 Shearman and Redfield on Negligence, sixth edition, page 132, viz.: 'Where the thing is shown to be under the management of the defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of proper care.' " (A long list of this and other states is cited in support of the doctrine as above announced.) It has been expressly held by the appellate courts of this state to be applicable to cases in which the act complained of clearly constitutes a tort. No medical skill or science is necessary to aid a layman in arriving at the conclusion that a sponge enclosed in the abdomen must cause harm to the human body, and that such a thing cannot ordinarily happen except as the result of negligence. The principle announced in *Brown* v. *Shortlidge, supra,* in which case a petition for hearing was denied by this court, bears directly upon the facts of the instant case and brings it within the rule announced in that case. There an operation

was performed for the removal of a child's tonsils. The patient was prepared for the operation by two nurses. A general anaesthetic was administered. An appliance was inserted in the child's mouth for the purpose of keeping it open. After forcing the gag appliance into the child's mouth, blood was noticed on the child's lips and upon examination a tooth was discovered lying loose in its mouth, and upon subsequent examination it was discovered that the bone in which the tooth was set was broken. The injuries were caused either by the insertion of the gag into the mouth or its manipulation after it was inserted. The appellant contended that the doctrine of *res ipsa loquitur* had no application to such a case. ■ The reasoning of the decision, by Parker, J., *pro tempore,* on the question of law directly involved in the instant case is adopted by this court as a sound exposition of the law on the subjects discussed. Those portions of the opinion which discuss questions which we have elsewhere considered in this opinion are omitted. The law as announced in that case is pertinently applicable to the instant case. It is set forth in the following language:

"The case of *Vergeldt* v. *Hartzell,* 1 Fed. (2d) 633, 635, is illuminating on the subject here involved. Therein it is said, quoting from *Evans* v. *Roberts,* 172 Iowa, 653 [154 N. W. 923] : 'It is appellant's contention that there is no evidence in the record to support a finding that he was negligent. With this we are unable to agree. Assuming for the purposes of this case, the soundness of the argument that, in performing an operation, a surgeon is not held to guarantee results, and that, if he possesses the measure of skill which the law requires, a mere failure of judgment in his choice of methods and means, is not actionable negligence, such concession is insufficient for the disposition of the issue of negligence in this case as a matter of law. This is not the ordinary case where a practitioner is sought to be charged with liability for alleged improper treatment of some bodily ailment or infirmity. He was employed to remove the adenoids from the plaintiff's throat and there is neither claim nor proof that he did not successfully remove them. His negligence, if any, was in failing to take due care to avoid injury to the undiseased parts in the vicinity of which the operation was performed; and while it may be true that, had the operation upon the adenoids

been unsuccessful and disappointing, no inference of negligence or want of skill would arise therefrom, it does not follow that this rule applies with the same force to an injury done by him to sound and undiseased parts of plaintiff's person which he was not called upon to treat and did not pretend to treat. If a surgeon, undertaking to remove a tumor from a person's scalp, lets his knife slip and cuts off his patient's ear, or if he undertakes to stitch a wound on the patient's cheek and by an awkward move thrusts his needle into the patient's eye, or if a dentist in his haste, leaves a decayed tooth in the jaw of his patient and removes one which is sound and serviceable, the charitable presumptions which ordinarily protect the practitioner against legal blame where his treatment is unsuccessful are not there available. It is a matter of common knowledge and observation that such things do not ordinarily attend the service of one possessing ordinary skill and experience in the delicate work of surgery. It does not need scientific knowledge or training to understand that, ordinarily speaking, such results are unnecessary and are not to be anticipated if reasonable care be exercised by the operator.' In *Wharton* v. *Warner*, 75 Wash. 470 [135 Pac. 235], the Supreme Court of Washington says: 'It is argued that whether a surgical operation was unskillfully performed is a question of science to be determined by the opinion and evidence of surgeons and that a bad result, standing alone, is no evidence of unskillful surgery. Both propositions are sound when soundly applied. The reason is that in most cases a layman can have no knowledge whether the proper medicine was administered or the proper surgical treatment given. Whether a surgical operation was unskillfully performed is a scientific question. If, however, a surgeon should lose the instrument with which he operates in the incision which he makes in his patient, it would seem as a matter of common sense that scientific opinion could throw little light on the subject.' In the case of *Dimock* v. *Miller*, 202 Cal. 668 [262 Pac. 311], . . . Mr. Justice Langdon says: 'If it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science.' . . . In the very recent case of *Ragin* v. *Zimmerman*, decided

March 25, 1929, and found in 206 Cal. 723 [276 Pac. 107], the Supreme Court strongly implies that when necessary the doctrine of *res ipsa loquitur* will be applied in cases of the kind. In that case the question involved the use of an X-ray machine, but the reasoning is equally applicable to the use of any mechanical equipment. The court cites with approval the following language of *Phoenix Co.* v. *Texas Co.*, 81 Cal. App. 61 [252 Pac. 1082], with reference to the doctrine of *res ipsa loquitur:* 'We think the doctrine may be urged with more than plausibility. Everything in the present case which in any way contributed to the accident was under the management of defendant . . . and that in the ordinary course of things the accident could not have happened if those having the management used proper care.' The exact meaning of the term *res ipsa loquitur* follows its translation, namely, 'the thing itself speaks,' or as is the generally accepted reading, 'the thing speaks for itself'. The application of the doctrine has never been confined to any set formula of fact. . . . We think the true rule is expressed in the cited cases, and the distinction made plain between cases involving the merits of a diagnosis and scientific treatment and cases where, during the performance of surgical or other skilled operations an ulterior act or omission occurs, the judgment of which does not require scientific opinion to throw light upon the subject. Counsel for appellant is fearful lest the affirmance of the judgment herein may set aside all of the well-known rules protecting physicians and surgeons in the practice of their profession and place upon them the burden of at all times demonstrating to a lay judge or jury the correctness of diagnosis made and treatments administered or means employed, thus making them, in all cases, insurers of a successful outcome. These fears are groundless. The affirmance will serve only to confine the rule within the limits intended, and while preserving to the surgeon all of the protection the law intended will also give to a helpless unconscious patient an assurance of the law's solicitude in his behalf.''

Many of the important questions raised by this appeal were decided adversely to respondents' contentions by the Shortlidge case, which is supported by ample authority in other jurisdictions, as well as by text writers and compilers of law publications generally. There are authorities which

hold a contrary view to that expressed herein, but we are of the opinion that the greater weight of authority and the better reasoning supports the conclusions which we have reached after a full consideration of the questions of law involved in the appeal.

That the doctrine of *res ipsa loquitur* is as appropriate to the facts of the instant case as it is to automobile accidents, elevator cases, gas explosions, bursting water mains, shipping cases, animals upon highways and the many other situations to which it has been applied is supported both by the rule of analogy and by definite authority. ▉ The rule is well settled by a multitude of decisions of the appellate courts of this state to the effect that the inference of negligence which is created by the rule *res ipsa loquitur* is in itself evidence which may not be disregarded by the jury and which in the absence of any other evidence as to negligence, necessitates a verdict in favor of the plaintiff. ▉ It is incumbent on the defendant to rebut the *prima facie* case so created by showing that he used the care required of him under the circumstances. The burden is cast upon the defendant to meet or overcome the *prima facie* case made against him. The defendant is not required to establish his defense by a preponderance of the evidence. All that is required is that he produce evidence which equals in evidentiary weight the inference which the doctrine creates in favor of plaintiff. The burden of proof as generally understood never shifts from the plaintiff to the defendant on the general issue of negligence. The inference of negligence unrebutted is actionable negligence coming within the doctrine of *res ipsa loquitur* and is sufficient to support a verdict for the plaintiff. (See text in 19 Cal. Jur. 717, and cases cited; 45 Cor. Jur. 1222 et seq.)

The defense made to the action consists of the defendant's testimony, the testimony of the two·nurse attendants, defendant's assistant, the anaesthetist and several physicians. It was based upon the claim that the patient was rather obese and her condition as to corpulency made it difficult to put her completely under the influence of ether and as a consequence the intestines were not in a state of repose, as would be the case of a less corpulent person, which condition increased the danger of the sponges becoming hidden under the folds of the intestines and in the cavities of

the abdomen. Further, that the attendants were attachés of the hospital and not the employees of defendant; that it was customary and good practice to rely absolutely upon the nurses furnished by the hospital in which the operation is performed to keep a check on the sponges; that operating surgeons are so intently engaged in the active performance of the operation that it would be imposing an unreasonable burden upon them to charge them with the duty of keeping count of the number of sponges used in the operation as a check against mistake; that the sponges used were of the kind furnished to and commonly used by the surgeons that operated in said hospital, and that circumstance alone brought the case within the rule that the degree of care or skill required of a physician or surgeon is that ordinarily possessed and exercised by physicians and surgeons in good standing practicing in the *same locality*. ■ We have already held upon authority that the failure to remove a sponge from the abdomen of a patient is negligence of the ordinary type and that it does not involve knowledge of *materia medica* or surgery but that it belongs to that class of mental lapses which frequently occur in the usual routine of business and commerce, and in the multitude of commonplace affairs which come within the group of ordinary actionable negligence. The layman needs no scientific enlightenment to see at once that the omission can be accounted for on no other theory than that someone has committed actionable negligence. General negligence cannot be excused on the ground that others in the same locality practice the same kind of negligence. ■ Even if the rule above contended for could be invoked, the evidence nevertheless shows that two other hospitals were conducted in the city of San Jose, to wit, the San Jose Hospital and the O'Connor Sanitarium, both of which were modern and fully equipped for surgical operations. One used the haemostat attachments for sponge use and the other used the metal rings. Two out of three recognized the danger of operating without the use of said appliances. It was the custom of the county hospital to furnish for use sponges or gauze pads, but it did not furnish standard or any attachments or safety appliances. Dr. Wilson, the medical director of the hospital, testified that the county hospital was a well-equipped institution for operations in surgery and that it was given a

high rating as such by the American Medical Association. The testimony of all of the physicians called by the respondents points irrefutably to the conclusion that it is the better, safer and approved practice to use haemostats or rings or sponge forceps in abdominal operations. Indeed, there is evidence in the record from which an inference may be drawn that the well and modernly equipped county hospital probably did have haemostats or rings in stock which could have been supplied had they been requested, and there is no testimony that it did not possess them. It was the custom, however, to use a plain gauze pad and none of the testifying physicians who operated there had ever used or seen a sponge attachment used at said hospital.

Dr. John Hunt Shepard, called on behalf of defendant, explained that the so-called sponges are really packing material and are not used in the sense of a sponge to "mop up blood", but to wall off the field of operation. He, as well as all other physicians who testified in the case, stressed the fact that it was very easy to lose a sponge in abdominal operations. And it was that hazard, no doubt, that prompted him to advise the San Jose Hospital to use the kind of appliance which he preferred for the reason, as he expressed it, it would be "harder to lose" sponges in the operation and easier to detect them with the use of the X-ray. If the hazard was as great as the expert witnesses described it to be, then the duty to use every reasonable check and precaution to minimize the risk must be proportionate with the admitted risk. The contention that a surgeon is exempt from liability, irrespective of consequences, if he uses the care ordinarily practiced by surgeons in the same locality, does not mean that ordinary care only is required in cases in which extraordinary care is manifestly required. The care required must be commensurate in all cases with the difficulties and inherent hazards attending the doing of the particular thing undertaken, as it is ordinarily performed by other physicians in the same locality in like cases. The skill required to be exercised is presumed to be care of a high degree, if the particular case, in reason and practice, requires it. It is relative to the thing to be done.

The fact that the hospital in which the operation was performed did not use safety appliances (but two others did) cannot stand as a defense to the action on the theory

that the operating surgeon conformed to the practice ordinarily followed in the same locality. The negligent practices of one hospital could not be accepted as a standard for the locality in which it is located. Besides, there is ample authority to the effect that the fact that the hospital fails to furnish necessary appliances will not protect the surgeon from liability. In the instant case, which appears not to have been an emergency operation, the surgeon might have refused to operate, or postponed the operation to such time as the necessary apparatus had been obtained. He accepted the assignment to operate some time in advance, and he knew every fact which might increase the hazards, as described by himself and the other physicians, before undertaking the operation. This being so, did he not assume the risk of unwittingly overlooking sponges which would, in all probability, have been eliminated by taking approved and reasonable precautions to prevent it? We think the answer must be that he voluntarily assumed the risk. The proposition is self-evident, and it requires no scientific knowledge of *materia medica* or surgery to answer it.

It is claimed as a defense that it would have been bad practice to have explored the abdomen in search of lost sponges and to have done so would have subjected the surgeon to adverse criticism. Dr. Ryan testified that he made no search after the count was announced, and to have done so might have increased very materially the risk to the patient. It was explained by one of the physicians that in removing a gall bladder it is necessary to cut the cystic duct, which is in the infected area, and it is proper practice not to spread the infection by going into the noninfected area. That no exploration or manipulation was made by the hands or otherwise is made clear by the testimony of the defendant. He offered evidence in justification of his failure to do so. The most that can be said is that someone announced the count as being correct and the incision was closed. The evidence is that there was but one experienced nurse on the case and her time was divided as to other duties. She was in and out of the room and had little knowledge as to what took place. The other attendant had had but a year and six months of training or experience and this major operation was the first time she had been in an operating room as an attendant, and she did not

claim that she either kept count of the sponges or knew how many were used, or that she was instructed to do so. The operation was performed under the immediate supervision and direction of the defendant and he is chargeable with notice of what was taking place about him which includes the important duty of observing whether a record of the number of sponges which are placed in the abdomen is being kept, and the responsibility of seeing that all sponges are removed before the incision is closed is upon him.

 As to the proposition that further exploration for sponges might endanger the safety of the patient, the subject was considered in *Davis* v. *Kerr*, 239 Pa. 351 [86 Atl. 1007, 46 L. R. A., N. S., 611]. We quote from 65 A. L. R. 1026 (annotations), the following portion of said opinion as there republished: " . . . Here the surgeon had reached the conclusion that he had removed all the sponges—a mistaken conclusion, but verified by the nurses' count. In reaching his conclusion, did he exercise ordinary skill? We see nothing in the evidence to warrant the inference that he did not; but, on the other hand, we find nothing to warrant the inference that he did, which is far more important, since the burden of showing care was upon him. Why was a foreign substance left in the parts, which the operating surgeon should have removed? It was for him to acquit himself of negligence with respect to it. The sponge escaped his observation. Why? Was it so hidden and concealed that reasonable care on his part would not have disclosed it, or were conditions such that, in his professional judgment, further exploration by him for sponges would have endangered the safety of the patient? In a word, did he do all that reasonable care and skill would require? Except as one or the other of these questions can be answered affirmatively from the evidence, the law will presume to the contrary, and attribute the unfortunate consequences to his contributing negligence."

The evidence bearing on the question as to whether a count was in fact made, or whether any other reasonable means or methods were employed to guard against the loss of sponges is so negligible, as a matter of law, as to have required a manual search, in case of doubt, to determine a grave and important fact. This is especially true in

cases of deep abdominal surgery. This duty cannot be delegated to nurses. (*Funk* v. *Bonham,* 204 Ind. 170 [183 N. E. 312].) There is no evidence in the case to show that the patient had suffered unduly from shock or that her condition was below that of the average person after a like operation. In fact, she was a woman 34 years of age, somewhat overweight, and gave evidence of unusual vitality in that it was difficult to bring her completely under the influence of ether, and she combatted for four months the ravaging effects of the foreign substance in her abdomen and survived a second operation to remove it. The only evidence offered in justification of a failure to make a manual exploration was that it might spread the infection. The danger of spreading infection during the operation would seem to have been as great or greater than it would have been to make an exploration immediately after operation. The same precaution against it would be taken in each instance. It is difficult to understand how the possibility of spreading infection could outweigh the necessity of making certain that all foreign substances had been removed from the abdomen, when error on his part would result in certain and inevitable injury to the health and might cause the death of the patient. There was no evidence that she was failing, or that the exploration was not made on any ground other than a mere possibility, matched against a certainty as to results. (*Wynne* v. *Harvey,* 96 Wash. 379 [165 Pac. 67]; 48 C. J. 1132.) In the circumstances of the instant case the defendant neglected to make such investigations and take such precautions as to assure him that he was justified in acting as he did in a very serious matter.

The decisions of this state, when they have spoken on the subject, have endorsed the doctrine that the surgeon is responsible for the acts of the nurse. In *Armstrong* v. *Wallace, supra,* while it is said that the question was not necessarily before them in that case, the court did say that "it does appear that a definite responsibility rests upon a surgeon in regard to knowledge upon his part as to whether or not the sponges used in the operation are all accounted for". In the instant case the operative surgeon was a member of the surgical staff and frequently performed operations in the hospital at the request of the medical director, and no doubt had some knowledge as to the quali-

fications of the staff of nurses which rendered service in such cases. The supervising nurse gave very little attention to the operation and the other attendant was wholly inexperienced. It must have been apparent to the operator that no one kept a count. A physician is answerable for the acts of another, operating jointly, for the acts and omissions of the other which, exercising reasonable diligence, he should have observed. (*Wynne* v. *Harvey, supra.*) The same rule would apply to nurses working under his direction.

 "The rule as stated in 21 Ruling Case Law 338 is to the effect that 'surgeons cannot relieve themselves from liability for injury to a patient caused by leaving sponges in a wound after operation, by the adoption of a rule requiring the attendant nurse to count the sponges used and removed, and relying on that rule as conclusive that sponges have been accounted for.'

"The surgeon had the power and therefore the duty to direct the nurse to count the sponges as part of his work in the opening and closing of plaintiff's abdomen and the putting in and taking out of sponges, and it was his responsibility to see that such work was done. He cannot relieve himself of liability by any custom or rule requiring the nurses to count the sponges used and removed." (*Armstrong* v. *Wallace, supra.*) The refusal of the court to give an instruction based on the principle above stated was held by the Appellate Court to constitute error. We are in accord with the holding of our District Court of Appeal.

The surgeon in absolute charge of and who is directing the operation, as defendant was doing under the admitted facts of the instant case, is responsible for the negligent act of the assistant in failing to remove a sponge from the abdomen.

 Plaintiff and appellant claims that the act of interring a sponge in the incision by the operating surgeon constitutes negligence *per se*. There are authorities in some jurisdictions which so hold. There is no direct authority in this state so holding. We are not inclined to so hold without a fuller presentation of the question than is made in the briefs. Inasmuch as the case was tried on the doctrine of *res ipsa loquitur* and no instruction was requested by appellant on the negligence *per se* theory, the plaintiff will not be heard to make the point here for the first time. The

doctrine of *res ipsa loquitur* seems to have been accepted by the bar and courts of this state as affording an adequate and reasonable remedy in this class of cases.

By instruction No. 11 the jury was told that reliance upon the nurses' count of sponges used is not a complete defense to the charge of neglect, even though it be shown that such was the custom of the locality in which the operation was performed. By instruction No. 15 the jury was told that if its members believed that the surgeon performing the operation had the management of all the tools, instruments and equipment used in performing said operation, including the sponges, and if they believed from the evidence that the leaving of a sponge within the abdomen of Mrs. Carauddo was such an accident that in the course of things does not happen if the surgeon operating uses proper care, the fact that the surgeon sewed up the incision without removing a sponge from the abdomen "affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care". This instruction evidently was framed on the theory that the doctrine *res ipsa loquitur* was applicable to the case. It is not as full or specific a statement of the doctrine as should have been given. The fact that it was the only one given which bore any semblance to a definition of the doctrine emphasizes the necessity of a full and accurate statement of the doctrine. The jury should have been instructed in unqualified language that if the surgeon closed the incision without first having removed the sponge, a *prima facie* case was thereby made against him as a matter of law, and it devolved upon the defendant to rebut the inference of negligence by showing that he exercised the degree of care required of him in the circumstances of the case. It is too clear for argument that leaving a sponge in the abdomen is a thing that does not ordinarily happen without an imputation of negligence on the part of the operator, and, as stated by the doctrine itself, "the thing speaks for itself". The burden is not upon the plaintiff to show by evidence that the thing does not ordinarily happen if proper care is used by the surgeon, but an inference of negligence arises from the act itself which relieves the plaintiff of the *onus* of offering evidence as to a lack of care on the part of the defendant. The inference stands in stead of evidence.

In two or more instructions the jury was told that if the defendant "used ordinary care in the performance of the operation", and that if he made "an ordinarily careful search of the abdomen", he thereby fulfilled all the requirements which the law casts upon him and he should be acquitted of the charge of negligence. This is not a complete or accurate statement of the law, even as applicable to medical cases. The rule is that if the surgeon complies with the practice and methods *ordinarily used* by reputable physicians practicing in the same locality in which the operation was performed, he cannot be held in damages for bad results which may ensue therefrom. The care to be exercised is not mere ordinary care, but it is relative to the *care ordinarily exercised* by surgeons in performing the particular operation. Some operations are of the most delicate kind and are attended by great danger unless care commensurate with the operation is observed. If the surgeon or physician conforms to the treatment or method and care ordinarily practiced by other physicians he is not liable for unfortunate results. This rule cannot apply, however, to acts which obviously fall within the classification of general negligence in a case in which no special skill or knowledge is required to evaluate the significance of said acts in arriving at a correct conclusion.

Instruction No. 38 is not a correct statement of the law. In substance it is as follows: If the jury finds that trained nurses assisted in the operation and that the responsibility for the preparation of the sponges and of their care was committed to the nurses and it was their duty to hand the sponges to the defendant as called for by him and to count them before and after they had been removed from the body of the patient and before the incision was closed and to report to the defendant whether the number removed corresponded with the number previously handed to the defendant, and this method was in general use in the locality where the operation was performed, "then I instruct you that defendant Fred S. Ryan was not himself guilty of negligence in requiring the count of the sponges". Whether the portion above quoted was the instruction as actually given we have no means of verifying. If it was intended that the word "not" should precede the word "requiring", the instruction would even then be contrary to the

views heretofore expressed. It would constitute error on the additional ground' that the instruction would absolve the physician of the duty of exercising any care in the matter. If given as it appears in the record, it would have no definite purpose unless it was meant thereby that the surgeon was justified in relying absolutely upon the nurses' count. In either event the instruction would be prejudicially erroneous. ▪ The instruction is framed on the theory that the attending nurses were trained nurses. The uncontradicted fact is that the nurse who was actually handling the sponges was not a trained nurse and was acting for the first time as such in a surgery case.

▪ Instruction No. 39 is not in conformity with the law of the case. By it the jury was told that none of the negligent acts of the nurses or of those who assisted the defendant in the operation, unless in the pay of the operating surgeon, were chargeable to him unless he directed the acts complained of or knew of the existence of such acts. Instruction No. 26 is also objectionable for the reasons pointed out in the instruction last above enumerated, and for other reasons set forth in this decision. The operation was admittedly under the control and direction of the defendant.

▪ The instructions are in conflict as to important matters of law. By instruction No. 11 the jury was told that conformity with the practices ordinarily prevailing in the locality is admissible in determining whether or not sufficient care has been exercised in a particular case; nevertheless it is the duty of a surgeon to exercise ordinary care in ascertaining that sponges have been removed from the abdomen of a patient upon whom he has operated and that duty "cannot be *delegated* to another without recourse". Further, that usage "cannot avail to establish as safe in law that which is dangerous in fact"; that "the test or the usage or practice of having a sponge nurse to count the sponges is competent as reflecting upon the care and diligence of the surgeon, but that reliance upon such custom alone is not a complete defense to the charge". In other instructions already noticed the jury was told that if the care of handing sponges to the surgeon was committed to said nurses and it was their duty to count them and to report to him whether or not all sponges were accounted for, and this was the general custom in said locality, he was not guilty of

negligence in relying on the nurses' count. The instruction is inconsistent with other instructions, and besides it confines the jury's field of inquiry as to negligence to the single issue of the surgeon's right to rely on said count, and ignores all other acts or omissions which it is claimed constituted negligence.

Objection was made that a defect and misjoinder of parties defendant arose, inasmuch as the complaint named other parties who were dismissed from the action by order of the court or otherwise. This action resulted in no prejudice to the remaining defendant. The question of misjoinder of parties in tort actions has been before this court on a number of former occasions. The most recent case is *Shea* v. *City of San Bernardino*, L. A. No. 15766, 7 Cal. (2d) 688 [62 Pac. (2d) 365], filed November 19, 1936. In that case the action was originally brought against the City of San Bernardino and the Atchison, Topeka & Santa Fe Railway Company, but on plaintiff's motion the action was dismissed as to the railway company prior to the taking of any evidence. The complaint was drawn on the theory that the respondent's injuries were caused by the joint negligence of both defendants. It is there said: " . . . treating the action as one brought against two joint tort-feasors, it is clear that no obstacle to recovery against one is presented because of the fact that the complaint charged only joint negligence. It is settled in California that in tort actions, when two or more persons have been concerned in the commission of the tort, the injured party may proceed either jointly or severally against such joint tort-feasors who are both jointly and severally liable and although the complaint may allege only joint negligence on the part of the joint tort-feasors it nevertheless states a complete and separate individual liability against each party so sued on account of the single act of which complaint is presented." (Citing cases.)

The judgment is reversed and the cause is remanded for a new trial.

Thompson, J., Shenk, J., Curtis, J., Edmonds, J., and Waste, C. J., concurred.

Rehearing denied.