[Civ. No. 14310. Second Dist., Div. Three. Jan. 3, 1945.]

INA HINDS et al., Appellants, v. I. M. WHEADON et al., Respondents.

Syril S. Tipton for Appellants.

Joseph A. Ball for Respondents.

SHINN, J.—The present action was brought by the widow and minor children of George T. Hinds to recover damages for his death. Decedent was employed by Allied Petroleum Corporation to weld two brackets upon the outside of a cylinder of a steel crude oil dehydrator. Defendants Fisher and

Haines were employees of Allied Petroleum. During the • welding operation the cylinder exploded and Mr. Hinds was fatally injured. The case was tried before a jury, the verdict was in favor of defendants, and plaintiffs have appealed.

It was alleged in the complaint that defendants undertook and agreed to prepare the cylinder of the dehydrator for the welding operation by removing all gasoline and gasoline fumes and gases by filling the cylinder with water; that they prepared the cylinder and had pumped water into it but that they did so negligently and so as to leave in the cylinder gasoline fumes and vapors, and they negligently failed to keep the cylinder full of water during the welding operation, as a result of which negligent acts the gasoline vapors were exploded. The evidence disclosed that two brackets were being installed to support an inlet pipe at the top of the cylinder. Each bracket had a right and a left plate at top and bottom. The brackets were first tacked on lightly by means of welds. The plates of the upper bracket were approximately 18 inches below the top of the cylinder. No explosion occurred while the final welds were being made on the lower bracket nor while the left plate of the upper bracket was being welded. The cylinder exploded while the final weld was being made to attach the right plate of the upper bracket. It was caused by the vaporizing of the residuum of oil which remained upon the inside walls of the cylinder, the vapor being ignited by the heat from the welding torch applied to the outside wall. This fact was demonstrated by the evidence and the parties are in agreement upon the point. It was also established by the evidence, and it is not questioned in the briefs, that the explosion would not have occurred if the cylinder had contained water at the point of the application of the heat. The cylinder was full of water shortly before the welding started. There was water inside the cylinder at all points where the welding was done except where the right-hand upper plate was being attached some 18 inches below the top. This fact appears from the expert testimony as to the condition of the inner surface of the metal at the points where the welds were made. There was no discoloration of the inner surface at any of the points where welds were made except the one where welding was in progress at the time the explosion occurred. The absence of discoloration was due to the presence of water at the several points and the absorption by the water of the excessive

heat. The left upper plate was on the same horizontal level as the right upper plate. Since there was water behind the former and none behind the latter, it is obvious that the water level was lowered in the interval between the making of the two welds to a point more than 18 inches below the top of the cylinder.

Upon the trial the questions of fact were reduced to the single issue whether defendants were negligent in failing to maintain the water at a level at least as high as the point of the highest weld. The question before us is whether defendants or either of them were shown to have been negligent as a matter of law.

The case has been on appeal before (*Hinds* v. *Wheadon* (1942), 19 Cal.2d 458 [121 P.2d 724]). In reversing a judgment of nonsuit the court said (p. 462): ''In the present case the absence of water in the dehydrator tank, which resulted in the explosion, is not such an occurrence as happens in the ordinary course of things if those in control of the matter have used the proper amount of care. Under the facts of this case, therefore, we think an inference of negligence on the part of defendants arises which they are required to rebut and which is sufficient to take the case to the jury.''

The case was tried and the jury were instructed upon the theory that the doctrine of res ipsa loquitur applied. It was not questioned that it was incumbent upon defendants to supply evidence to meet the inference that they were guilty of negligence in failing to maintain the water at a proper level. The point of disagreement upon the appeal is the following: plaintiffs contend that defendants were required to prove the cause of the lowering of the water level and that it was a cause that was not due to their negligence, while defendants insist that they were not required to prove the cause of the lowering of the water level but only facts from which the jury could determine that they used ordinary care to keep the water at a safe level. Defendants did not prove the cause of the lowering of the water level but they did furnish proof of the precautions which they took to prevent it. This proof, they contend, was sufficient to warrant a conclusion that they were not negligent and to justify the verdict in their favor.

Therefore the question is whether under the doctrine of res ipsa loquitur, as applied to the particular factual situation involved, the defendants can defeat the charge of negligence by proof that they used ordinary care to prevent the accident,

if they fail or are unable to prove the exact cause of the accident.

The fluid container consisted of a steel cylinder 10 feet in diameter and 12 feet high, resting upon a concrete foundation. The top of the cylinder was a convex steel dome. The cylinder held 185 barrels of fluid and the dehydrating operation consisted of the separation of oil from water by electric process. The dehydrator was not in operation and no electric currents were present at the time of the explosion. Fluid entered the cylinder through a 2-inch line (which we will call line A) which extended through the wall of the cylinder at a point near the top and above the points where the welding was done. This line extended from the ground level, where the fluid was pumped through a heater into the line. The brackets which were welded onto the cylinder were to serve the purpose of supporting this line and preventing vibration. In line A were three check valves which prevented fluid from flowing out of the cylinder. Another line, B, entered the top of the cylinder. No fluid could run from this line except when the dehydrator was full and under pressure, but under those conditions oil would flow through this upper line to a storage tank, although a small portion of it could be diverted from this outlet line through a ½-inch line, C, on the outside of the cylinder which would carry it to the ground into a waste line leading to a sump. The flow through line C was controlled by a valve close to the ground and which was operated manually. The line was cut off below this valve and the fluid ran through a funnel in the lower end of the line so that it was possible to observe the quality of fluid leaving the cylinder through line B. Lines A, B and C may be disregarded in our further discussion for the reason that fluid could not have left the cylinder through them by gravity flow. There were other outlets through which it could have passed. Fluid could enter the funnel from the cylinder by means of five small bleeder pipes which emerged from the cylinder at different heights, each controlled by a separate gate valve so that fluid could be run from any of five different levels and could be observed as it entered the funnel. Thus fluid at or above the level of the several outlets could be run into the funnel and on into the sump by opening one or more of the valves. There was an outlet from the bottom of the cylinder, a 4-inch line, D, controlled by a 3-inch gate valve 1½ feet

above the ground and constituting a waste line to the sump. This line was used only to run off the waste at the bottom of the cylinder. When the dehydrator was not in operation, fluid could flow out of the cylinder only through this line D, when the 3-inch gate valve was open, or through any one of the five small bleeder lines that was open. Fluid running out from the bottom through line D would not be observed except where it emerged from the line at the sump, but fluid from any of the five bleeder lines could be seen running into the funnel which led to the waste line.

The evidence of the defendants was that Chester Fisher, an employee of Allied Petroleum, under the instructions of the latter's superintendent, pumped clean water into the dehydrator for about two hours in the morning of the day before the accident. He then opened the valve in the ½-inch line C while the pump was in operation and the cylinder was full of water under pressure, and clean water flowed from the line into the funnel. This operation would prove that the dehydrator was full of fluid under pressure and that all of the oil which would leave by that process had been flown out with the water. Some twenty-three hours later, on the morning of the accident, he again started the pump and clean water immediately flowed from the top of the cylinder and down through line C. If, as testified to, the water began to flow immediately when the pump was started, the operation would prove that the cylinder had remained full of water for twenty-three hours. Other testimony was that the valve in line D and the five valves in the bleeder lines were all closed before the welder arrived. The testimony was that when he arrived about 10 a. m. he asked whether the dehydrator was ready for him to work on and was told that it was full of water. Fisher then started the pump in the presence of the welder and the superintendent for Allied Petroleum, and clean water immediately ran through line C into the funnel. These facts would show that the cylinder remained full from 8:30 a. m. when Fisher had run the pump until 10 a. m., when the test was made for the welder. After this operation Mr. Hinds said, "O.K. shut her down"; the pump was shut off and Mr. Hinds went to work. Fisher assisted him for 10 or 15 minutes and then left, but was called back by Mr. Hinds some 35 to 45 minutes later. By that time the two plates of the lower bracket and the left plate of the upper bracket had been completely welded to the cylinder. The upper part of

the right plate also had been welded; Fisher held the ladder for the welder as he started to weld down the outside of the right plate, and while he was welding at the right foot of the plate the explosion occurred. Although there remained on the inside wall of the cylinder a residuum of oil which the water would not remove, it is the accepted practice to do welding as the work in question was being done if the cylinder is full of water.

If the testimony of defendants' employees was believed —and in view of the verdict it must have been believed— defendants had placed the dehydrator in a safe condition for the welding; all valves were tight at the time the final test was made just before the welding started and the cylinder had remained full of water for 23 hours immediately prior to 8 a. m. on the day of the accident and from 8:30 until 10 a. m. on the morning of the accident. The water therefore must have escaped through a partially open valve. No fluid was seen running out of any of the five bleeder lines and the only blind one was line C at the bottom, which ran underground to the sump, some 12 feet from the dehydrator. Mr. Fisher testified that he did not touch any of the outlet valves on the day of the accident. The valve in line C, through which fluid could run only when the pump was in operation and the cylinder full, was open. Decedent and Fisher, so far as disclosed, were the only persons around the dehydrator during the welding. If it was believed that one or the other accidentally or intentionally opened a valve and failed to completely close it, there was no evidence pointing to either of them as the one who was guilty of that act. There was the testimony of Fisher that he did not do it. Certainly there was no evidence that either one of them would have had any purpose in opening any one of the six valves through which fluid could be released. Mr. Hinds was using a ladder in his work. In the early part of the work the foot of the ladder rested upon the dirt. When Mr. Fisher was called back to give further assistance, it was to hold the ladder, which was rested upon cement in the later stages of the work. The valve heads in line D and those in the bleeder lines were of the type used on the ordinary garden faucet, although the one in line D was 3 inches in diameter.

The doctrine of res ipsa loquitur was adopted in this state in the decision of *Judson* v. *Giant Powder Co.*

(1895), 107 Cal. 549 [40 P. 1020, 48 Am.St.Rep. 146, 20 L.R.A. 718], as declared in Shearman and Redfield on Negligence, section 60: ''When a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care.'' Subsequent decisions have not changed the rule. The explanation which the defendant is required to make is an explanation of his conduct and, to be complete, it must be as broad as the inference. ■ It is for the jury to say whether the inference has been successfully met (*Ireland* v. *Marsden* (1930), 108 Cal.App. 632 [291 P. 912]; *John* v. *B. B. McGinnis Co., Inc.* (1940), 37 Cal.App. 2d 176 [99 P.2d 323]; *Maryland Casualty Co.* v. *Matson Nav. Co.* (1918), 177 Cal. 610 [171 P. 427]), although if the defendant fails to produce substantial evidence of the use of due care, as where it appears that precautions that should have been taken were not taken, the defense will be held insufficient as a matter of law. (*Chutuk* v. *Southern California Gas Co.* (1933), 218 Cal. 395 [23 P.2d 285].) ■ All that he need do in any case is to produce evidence which equals in evidentiary weight the inference which the doctrine creates in favor of plaintiff. (*Ales* v. *Ryan* (1936), 8 Cal.2d 82 at 99 [64 P.2d 409].)

■ It was clearly the duty of the defendants to remove the loose oil from the cylinder and to have it full of water unmixed with oil. It was also their duty to exercise ordinary care to keep the water level at a point above the highest weld while the work was being done. If the water had been there, the work could have been done in safety; without water an explosion would naturally result because of the oil on the cylinder wall which could not be removed by the flow of water. There was no conflict in the evidence as to the precautions which had been taken by defendants. The jury were justified in believing that at the time the work started the cylinder was in a safe condition. They were also justified in believing that it had been tested for its ability to hold water without leakage and that all outlet valves had been closed. Defendants' duty was to use ordinary care. There was no evidence of any inspection made during the progress of the work to ascertain whether the water was remaining

at a safe level. The implied finding of the jury was that such further inspection was not essential to the exercise of ordinary care. This was a reasonable conclusion in view of the testimony as to the tests previously made. ▮ Since the question of negligence is one of fact, the conclusion of the jury that a given act or omission did or did not constitute negligence may not be disturbed on appeal, if the evidence upon the issue is such as to allow a difference of opinion among reasonable minds. The res ipsa loquitur doctrine does not abrogate this familiar rule. ▮ It does not relieve a plaintiff who charges negligence from the duty of proving it by a preponderance of the evidence. It is a rule of evidence and not of liability and it does not impose upon one charged with negligence the duty of exercising a higher degree of care than would be required of him in a case where the doctrine was inapplicable. ▮ There is no rule of law applicable to all cases of simple negligence which requires a defendant to prove the exact cause of an accident in order to meet an inference that it was caused by his negligence. ▮ Undoubtedly there are cases where the defendant would have to show the immediate cause of the accident and that it was not due to his negligence, as where it must necessarily have resulted from his own act or omission. This is clearly not such a case. ▮ After the jury had accepted as true the testimony of defendants' witnesses, the only logical conclusion as to the cause of the accident would be that some valve had been partially opened, either intentionally or accidentally, during the progress of the work. The implied finding was that this did not happen by reason of any act or omission on the part of defendants, at least any negligent act or omission on their part. This conclusion had direct support in the testimony of the witness Fisher. There was no evidence whatever that the defendants touched or would have had any reason to touch any of the valves while the work was going on. The jury of course could have refused to believe the testimony of defendants' witnesses as to the making of the tests, but having found that they were made and that the tank was watertight, there was no more reason to believe that the defendants opened a valve, either accidentally or intentionally, than there was to believe that Mr. Hinds had done so. ▮ In order to reverse the judgment we would have to hold that the defendants could defeat the charge of negli-

gence only by proving that Mr. Hinds or some third person opened one of the valves. It is obvious that they would be unable to produce such proof. A reversal would mean that the judgment must go against the defendants because of their inability to prove the immediate cause of the accident, even though there was ample evidence to support the finding that they exercised ordinary care to prevent it. Such a holding would be without support in reason or authority.

The jury were instructed that the burden of proof upon the issue of negligence rested upon plaintiffs and were also instructed in the doctrine of res ipsa loquitur. Plaintiffs complain of a part only of the instruction on preponderance of evidence, reading: ''If in this case you are unable to determine, by a preponderance of the evidence, whether the defendant was or was not guilty of some negligent act or omission but could only determine that issue by resorting to guess or conjecture, then under such circumstances the plaintiff has not sustained the burden of proof and in such event your verdict must be for the defendant.'' It is claimed that the quoted portion of the instruction was in conflict with and deprived plaintiffs of the benefit of the res ipsa loquitur rule, in that it required plaintiff to prove a particular negligent act or omission on the part of defendants. The res ipsa loquitur instruction was comprehensive and in all respects correct. The opening sentences were as follows: ''From the happening of the accident involved in this case, as established by the evidence, there arises an inference that the proximate cause of the occurrence was some negligent conduct on the part of the defendant. That inference is a form of evidence, and if there is none other tending to overthrow it, or if the inference preponderates over contrary evidence, it warrants a verdict for the plaintiff.'' The two instructions read together were consistent and stated the law fully and fairly.

The judgment is affirmed.

Desmond, P. J., and Wood (Parker), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 1, 1945.