[Civ. No. 7814. Third Dist. Jan. 31, 1951.]

RALPH WARD et al., Appellants, v. JOSEPH F. SILVERIA et al., Respondents.

E. J. ILJERTAGER et al.. Appellants, v. JOSEPH F. SILVERIA et al., Respondents.

Tebbe & Correia and Mark M. Brawman for Appellants.

Floyd Merrill and J. Everett Barr for Respondents.

VAN DYKE, J.—Ralph and Elizabeth Ward, plaintiffs and appellants, brought action against defendants and respondents to recover damages suffered through loss, by fire, of their household furniture and personal apparel. E. J. and Erling Hjertager, plaintiffs and appellants, also brought action against defendants and respondents for damage suffered by destruction of two dwelling houses owned by them, occurring in the same fire that destroyed the Ward property. The Wards occupied one of the two dwellings.

The actions were based upon negligence; that of the Wards also upon warranty. The two causes were consolidated for trial. Judgment went for defendants, and the plaintiffs in each action appealed.

Respondents Silveria and Arnberg, as copartners, were engaged in the business of renting and supplying gas tanks to consumers of liquid propane for domestic use, and of keeping such tanks supplied with liquid propane. On the day preceding the fire, respondents had leased to appellants Ward, and had installed next to the cottage they were occupying, a tank with supplemental equipment, which they attached to the Wards' stove within the cottage. The lease obligated them to install the equipment properly, connect it for use, maintain it in proper safe working condition, and to keep an adequate supply of liquefied gas in the tank. The installation was completed late in the evening, the tank being set up within a foot of an exterior wall of the house. The fire occurred on the afternoon of the following day. Both houses, and the contents of the Ward house, were completely destroyed.

One Pelham testified that he witnessed the actual start of the fire. He said that his attention was attracted by a loud, hissing noise from outside the Ward house. He looked toward the Ward house and the gas tank. He saw vapor blowing out of the top of the gas tank and against the outside wall of the house. It was being forced up the wall to the projecting eaves, which forced it back downward. As he looked, it started burning all at once. He likened the start of the flames to an explosion. Mrs. Ward said that just before the fire started she was using the stove for cooking and that there was no fire anywhere else around the house; that while at the stove she heard a loud, whistling sound from without; that she ran outside, and found the tank in flames and the wind blowing the fire toward the house; that at first only the tank was flaming and the house had not yet caught; that the flames seemed to be coming from the top of the tank. Appellant Erling Hjertager saw the fire. He said he heard the hissing sound while 200 feet away and saw flames shooting from the top of the tank to the eaves of the house some 6 or 8 feet above the tank; that the flames continued to shoot from the tank until the house was completely destroyed by fire. It further appeared that the tank and accessory fittings were made so as to withstand substantial internal expanding pressure which would vary as the temperature varied; that the internal pressure rose as the outside temperature rose. The tank came from the manufacturer equipped at the top with an exhaust valve to take care of any pressure greater than normal operating pressure that might be formed in the tank. The valve was set to open at 250 pounds pressure per square

inch. The normal operating pressure in the tank approximated 150 pounds. Respondent Arnberg, who installed the tank and fittings, testified that in order to raise the pressure in the tank to 250 pounds there would have to be heat enough to raise the temperature within the tank to approximately 134 degrees; that the released gas would go out into the air and be harmlessly dissipated unless fired by some ignition source such as an open flame or an electric spark after the gas had sufficiently mixed with air to reach the combustion point. Respondents further furnished testimony to the following effect: After such equipment is installed the consumer is not required to make any adjustments of the regulators or valves in order to make use of the gas; the only time they are to touch the tank is when they want to turn off the fuel into the house and the only thing they have to do in order to use the gas is to turn it on at the user's appliance, in this case the kitchen stove (Mrs. Ward testified that except to use the stove she had not touched the equipment up to the time of the fire and did not know of anyone else having done so); that before installing the equipment respondents had inspected the same and found it in good shape; that they opened up the valves, made sure there were no leaks anywhere and that the valves were all tight; that they filled the tank at their plant; that it had not been used prior thereto; that they inspected the regulator and found it worked properly, testing the flow of gas and the registration of pressure; that on arriving with the equipment at the Ward dwelling they selected the place of installation, set up the tank on its ready-made foundation, connected the tank with the Ward stove and then tested for leaks throughout the equipment, using a flame test; that such a test was adequate, although very slow leaks were sometimes better found by using the soap bubble test; that they did not test the release point of the escape valve by raising the pressure in the tank to 250 pounds; that if the valve opened and gas was blown out as it would be, it would not ignite unless it came in contact with an ignition agency such as a flame, a spark, or a hot wire, and then only after mixing with air so as to attain a combustible stage—approximately ten parts air to one part gas; that even then it would probably only flash and blow out.

The trial court found as follows: That respondents installed the tank and complementary equipment, using reasonable care and caution; that they filled the tank with propane gas; that respondents did not have, after such installation

118

and filling of the tank, exclusive control of the equipment; that after the installation was complete and before any damage occurred the appellants Ward had the use, control and management of the gas container with its regulator, valves, pipes and connections; that respondents did not either negligently or carelessly allow or permit the gas to escape, ignite and burn, and that the damage from the destruction of the houses and contents was not caused by any carelessness or negligence of respondents.

As to the action based on warranty, the court found generally against the allegations of breach of the claimed warranty, finding that allegations to the effect the fire was caused by negligence of respondents and that the equipment leased was defective or unfit for the purpose for which leased, were untrue. The court further found that the equipment did not "leak" gas and that respondents had carefully, and properly, done all things in and about the installation, equipping, fitting and connecting of the tank, tubing, valves and fittings, all of which the court found to be, when installed, in sound and safe condition and free from defects.

Appellants contend that the findings of the court against liability of respondents are not sustained by the evidence. They contend that on the issue of negligence they made a case coming within the doctrine of res ipsa loquitur and therefrom they argue that the trial court was compelled to draw the inference of negligence and to grant them judgment for their damages because of the failure of respondents to produce sufficient proof in rebuttal.

We will concede for the purpose of testing the validity of appellants' contentions that the doctrine of res ipsa loquitur was in part at least applicable under the facts of this case and that therefore an inference of negligence on the part of respondents would be warranted. ▮ However, it is well settled that "the application of the doctrine does not give a plaintiff an absolute right to a judgment in every case. (*Raymer* v. *Vandenbergh*, 10 Cal.App.2d 193 [51 P.2d 104]; *Nicol* v. *Geitler*, 188 Minn. 69 [247 N.W. 8]; *Sweeney* v. *Erving*, 228 U.S. 233 [33 S.Ct. 416, 57 L.Ed. 815].) It does not shift the burden of proof, and when the defendant produces evidence to rebut the inference of negligence, it is ordinarily a question of fact whether the inference has been dispelled." (*Druzanich* v. *Criley*, 19 Cal.2d 439, 444 [122 P.2d 53].) ▮ It is equally well settled "that the inference of negligence which is created by the rule res ipsa loquitur is in itself evidence which may not be disregarded by the jury and

which in the absence of any other evidence as to negligence, necessitates a verdict in favor of the plaintiff. It is incumbent on the defendant to rebut the prima facie case so created by showing that he used the care required of him under the circumstances." (*Ales* v. *Ryan*, 8 Cal.2d 82, 89 [64 P.2d 409].)

Notwithstanding the inference of negligence which may have arisen, it is still open to the defendant to rebut the inference, and when he introduces evidence as to the care he has taken it may become, and we think in this case it did become, a question of fact for the trial court, sitting as the trier of fact, to determine whether or not such proof did rebut the inference. (*Hinds* v. *Wheadon*, 67 Cal.App.2d 456 [154 P.2d 720] (explosion of dehydrator tank); *Holt* v. *Henry*, 58 Cal.App.2d 168 [136 P.2d 97] (collapse of platform); *Johnston* v. *Black Co.*, 33 Cal.App.2d 363 [91 P.2d 921] (collapse of fluoroscopic table); *Raymer* v. *Vandenbergh*, 10 Cal.App.2d 193 [51 P.2d 104] (skidding on rainy night); *Rayl* v. *Syndicate Building Co.*, 118 Cal.App. 396 [5 P.2d 476] (break in elevator cable); *Pontecorvo* v. *Clark*, 95 Cal.App. 162 [272 P. 591] (fall from roller coaster); *Frederick* v. *San Francisco-Oakland Terminal Rys.*, 48 Cal.App. 336 [191 P. 1020] (overturned streetcar). As hereinbefore noted, respondents produced testimony as to their care in the inspection and testing of the equipment before and after installation and as to the general fitness of the equipment from the standpoint of safety in use. The showing made was sufficient, we hold, to authorize the trial court to determine that they had not been guilty of a lack of due care.

Appellants specifically charge that they have proven negligent conduct on the part of respondents in the premises by proof that the tank was installed in close proximity to the outer wall of the Ward residence. They say that installing an apparatus of this nature which, upon the release of the safety valve, would discharge large amounts of propane gas close to the wall below projecting eaves, was negligence in that it would create a condition such that the gas might be ignited and thus fire the building. But here again we think that whether or not such installation was negligent was a question of fact for the trial court. There was testimony that a discharge of gas through release from the escape valve would be of short duration and would ordinarily be rapidly and harmlessly dissipated into the surrounding air; that it could not be ignited even if in part at least it attained a combustible

mixture with air, unless there was open flame or spark in contact with that part of the mixture which was combustible and that no such ignition agency was reasonably to be anticipated. · We think it cannot be said as a matter of law that the installation complained of was negligent.

What we have said on the issue of negligence applies equally to the claim of warranty as to which the court found, as above noted, that the warranty had not been breached, but on the contrary that the equipment as furnished and installed was reasonably fit for the purposes for which it was to be used and we must, therefore, hold that this assignment of error likewise must be held to be invalid.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied March 2, 1951.