[Civ. No. 6274.   Third Appellate District.—February 5, 1940.]

A. L. HARMON, Respondent, v. SAN JOAQUIN LIGHT & POWER CORPORATION (a Corporation), Appellant.

Thomas J. Straub, W. H. Spaulding, John J. Briare and F. H. Pearson for Appellant.

Joseph Barcroft, Swanwick, Donnelly & Proudfit and Tom W. Henderson for Respondent.

THOMPSON, J.—The defendant has appealed from a judgment of $32,500 rendered pursuant to the verdict of a jury. The damages were awarded for personal injuries sustained as a result of inadvertently coming in contact with a sagging high-power electric wire carrying 12,000 volts of electricity.

The appellant contends that the judgment is excessive; that the court erred in giving to the jury an instruction on the subject of *res ipsa loquitur*, and that the plaintiff was guilty of contributory negligence.

The defendant maintains and operates a high-power electric system in Madera County, including a plant and apparatus with poles and wires extending along a public highway called "Dairyland Road". The wires carried a load of 12,000 volts of electricity. For some time prior to the accident one of the wires, which had become dislodged from a cross-arm, was permitted to remain sagging within a dangerous proximity of the ground. On June 2, 1937, the plaintiff, while riding a horse and driving a herd of cattle along that highway, in attempting to guide the cattle, raised his right arm and inadvertently came in contact with the high-power wire. The electricity passed through his body, killing his horse and six cows. He was violently thrown to the ground unconscious and thereby sustained serious injuries.

The implied finding of the jury is not disputed to the effect that the defendant was guilty of negligence in permitting an uninsulated electric wire carrying a load of 12,000

volts of electricity to remain suspended along a public highway sagging within eight and a half feet of the ground.

It is suggested that the plaintiff was guilty of contributory negligence in raising his hand, from his position on horseback, so as to bring it in contact with a sagging electric wire which was plainly visible in the daylight. The burden of proving that the plaintiff was guilty of contributory negligence was on the defendant. (19 Cal. Jur. 697, sec. 119.) The jury determined that issue against the defendant. That implied finding is adequately supported by the evidence. There is no evidence the plaintiff saw that sagging wire, or that he knew it was charged with electricity. He was engaged in driving a herd of 175 cattle along the highway. Some of the cows became excited and ran in the wrong direction. In the emergency, seeking to turn them in the proper course, the plaintiff spurred his horse forward, yelling at the cows and raising his hand to attract their attention and guide them back in line with the herd. In doing so his wrist inadvertently came in contact with the drooping wire. Instantly there was "a big noise like thunder". The horse and rider were violently thrown to the ground, together with six cows. This is a sufficient showing to exempt the plaintiff from contributory negligence as a matter of law.

We may not say as a matter of law that the judgment of $32,500, under the circumstances of this case, is excessive, or that it was the result of passion and prejudice on the part of the jurors. Prior to the accident, the plaintiff was a vigorous, able-bodied young man twenty-six years of age. He then had no physical ailments. His regular occupation was that of a cowboy. He was an expert rider, and played the violin proficiently. He was considered a "tophand" on a stock range and in handling cattle. He was also a rodeo performer.

The injuries to the plaintiff were very serious. It is marvelous that 12,000 volts of electricity could pass through the body of a human being without killing him, especially under circumstances which resulted in the death of the horse, and six cows which had no immediate contact with the rider of the horse. The plaintiff was unconscious for some time after the accident. He remained in the hospital for forty-two days thereafter. He was compelled to use crutches for three

months and a cane for an indefinite time. His ankle was badly burned, necessitating repeated skin-graftings. He suffered great pain. There is evidence that he received serious injuries to his right arm, his ankle, his hip and his back, that he suffered a 75 per cent loss of motion in the ankle, a 50 per cent loss of flexibility of his right arm, and a loss of muscular control, preventing him from performing efficient labor and from playing his violin. He could no longer ride a horse with comfort or endurance. He continued to suffer pain from his hip and ankle. His eyesight and his hearing were seriously and permanently impaired. Five medical experts testified to the serious injuries which he received. Doctor C. C. Cowan, who examined his eyes and his ears by means of scientific instruments, testified that he had suffered a loss of vision approximately 50 per cent of his normal sight; that his loss of hearing in the right ear was about 40 per cent, and that of the left ear about 25 per cent of the normal condition; that these defects of sight and hearing were not only permanent but progressive, that is, it was getting worse. He said that the impairment of plaintiff's sight and hearing indicated that his brain cells were affected and that his mind might be affected. Doctor D. H. Ransom testified that the injuries to plaintiff's arm, leg and ankle resulted in a 25 per cent disability which he considered "permanent". Doctor B. E. McDowell testified with respect to plaintiff's eyes that the use of glasses would not correct his defect of eyesight; that the drainage communicating with the "brain cells, or the nerve cells in the brain are very much affected by that to a large extent, *to a large extent destroyed*"; that he suffered "brain injury or brain deterioration, which "could go on to blindness", and total deafness, and which might result in impairing his mind. The doctor said that his vision and his hearing were getting worse. Some of the physicians testified that his vision was confined to a narrow radius, and to a limited distance. Nonexperts testified that since his accident the plaintiff was unable to do hard work; that he could ride and get about only with great difficulty. One witness said that: "Now, he is sluggish, he can hardly get around, and he can't stand nothing no way. It seems like just a little walk or anything gets him out. . . . He is always laying around the bed"; that "He was quite a hand to read. . . . [Now] he can't read to do any good, just large print. If he

gets any letters or something like that, some of the boys would read it for him;" that he could no longer ride the range, or rope a steer for branding purpose as he formerly could, and that he was unable to play his violin with his former skill.

There is a serious conflict of evidence regarding all of the foregoing asserted injuries. But upon a careful reading of the record, prompted by the size of the judgment and the strenuous attack upon its alleged excessiveness, we are persuaded the judgment is adequately supported by the evidence.

The appellant relies on the result of the cross-examination of plaintiff, and upon photographs and several reels of moving pictures to establish "conclusive evidence" that his ability to run, walk or ride a horse were not impaired by the injuries sustained and that neither his hearing nor his eyesight was seriously affected. It is argued that the cross-examination of the plaintiff in the presence of the jury demonstrated the fact that he could clearly hear questions propounded to him in a low tone of voice at a considerable distance. It is apparent that test of plaintiff's ability to hear was addressed to the credibility of the witness and to the weight and sufficiency of the evidence. The jury was far better qualified to determine that question than is this court. The jurors observed that experiment and we did not. Those questions were addressed almost exclusively to the province of the jury. We may not ordinarily interfere with the province of the jury in that regard. They were properly instructed that they must render a verdict solely in accordance with the evidence adduced and that they should not permit passion or prejudice to govern their decision.

The respondent severely criticizes the circumstances under which the photographs and moving pictures were taken. It is not necessary to discuss that question. It is undoubtedly true that pictures which absolutely refute the conclusion to be drawn from oral testimony regarding a particular fact should be conclusive on that particular subject. But the pictures which were received in evidence in this case merely created a conflict. It was the province of the jury to reconcile that conflict if possible, or to determine the weight and sufficiency of the evidence in that regard.

Moving pictures should be received as evidence with caution, because the modern art of photography and the devices of an ingenious director frequently produce results which may be quite deceiving. (83 A. L. R. 1315, note.) An article in the February Readers Digest, entitled "Tricked Into Acting", is an illustration of that fact. Telescopic lenses, ingenious settings of the stage, the elimination of unfavorable portions of a film, an angle from which a picture is taken, the ability to speed up the reproduction of the picture and the genius of a director may tend to create misleading impressions.

In the present case the moving pictures throw no light on the plaintiff's alleged deafness. The pictures are not conclusive on his limitation of vision. The doctors testified that his vision was limited in distance and radius. The pictures do show him in the act of catching a ball thrown to him by a young lady. But we are unable to determine the distance or direction from which the ball was tossed to him. It is possible that the young lady stood quite close to him, and that she took particular pains to toss the ball within the narrow radius of his vision as testified to by the physicians. The plaintiff may have been inspired to exert himself to make a favorable showing of his ability under the circumstances in spite of pain and his disabilities. Naturally, pictures will not reproduce the pain which may be endured by a subject. Serious muscular disability may become apparent only after a period of strenuous exertion. These were all questions for the determination of the jury. There is ample oral evidence to support the findings of the jury in that regard. Reputable physicians testified positively that the plaintiff possessed serious defects and that the injuries were permanent. Under such circumstances we are not disposed to interfere with the conclusions of the jury.

Numerous other cases have been cited to demonstrate the contention that the verdict in this case is excessive. It is impossible to reconcile the amounts of judgments in various suits for damages in personal injury cases. The circumstances and ailments in various cases differ so radically. The purchasing power of money in times of inflation or depression is an element to be considered in determining whether a judgment is excessive. The jury has a wide discretion in determining what sum of money will reasonably compensate

one for injuries sustained. The mere fact that a judgment appears to be large does not warrant a court of review in determining that a verdict is the result of the passion or prejudice of a jury. That fatal result should clearly appear from the record. We are unable to say, as a matter of law, that the judgment in this case is so excessive as to warrant us in interfering with the finding of the jury.

█ The court properly instructed the jury on the subject of *res ipsa loquitur* that when facts have been established which make that doctrine applicable, the burden ''of meeting such presumption'' of negligence is cast upon the defendant. That was not a ''formula instruction'', requiring the inclusion of all the necessary elements of the entire theory upon which the plaintiff seeks to recover damages. (*Douglas* v. *Southern Pac. Co.*, 203 Cal. 390 [264 Pac. 237].) The instruction in the present case properly asserted that the presumption created by proof of facts raised by the doctrine of *res ipsa loquitur* did not have to be overcome by a *preponderance* of evidence, but on the contrary it declared that it was necessary for the defendant to produce only sufficient evidence to ''balance the presumption''. The court then said:

''If, after a consideration *of all of the evidence in the case* bearing upon the defendant's alleged negligence, including such presumption, you are convinced *by a preponderance* of the evidence that the defendant was negligent, and that such negligence was the proximate cause of the injuries, if any, sustained by the plaintiff, your verdict should be for the plaintiff.''

The jury was elsewhere fully and properly instructed with respect to the doctrine of contributory negligence. The challenged instruction was neither erroneous nor prejudicial.

The judgment is affirmed.

Pullen, P. J., and Tuttle, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 6, 1940.