[L. A. No. 22868. In Bank. Apr. 16, 1954.]

ROBERT BURR et al., Respondents, v. SHERWIN
WILLIAMS COMPANY, Appellant.

Ray W. Hays and James N. Hays for Appellant.

W. R. Bailey, Wingrove & Brown, Meredith Wingrove and Lee G. Brown for Respondents.

GIBSON, C. J.—In July 1949 plaintiffs, Robert Burr and his wife, owned approximately 135 acres which were planted in cotton. At Burr's request, defendant Patton, a field man for defendant Central Valley Cooperative, hereinafter referred to as the cooperative, inspected the crop, found insects known as cotton daubers and advised plaintiffs to use a spray containing DDT, which is an insecticide. Burr agreed to have the cotton sprayed in accordance with Patton's recommendations and authorized him to make the necessary arrangements for obtaining the spray and hiring an aviation company to apply it. Patton, with the approval of Burr, engaged defendant Rankin Aviation Industries to do the spraying. The cooperative delivered to Rankin at the airport five new sealed, 30-gallon, nonreturnable steel drums of "DDTOL, 25 per cent Emulsifiable," which had been manufactured by defendant Sherwin Williams Company and delivered to the cooperative on consignment. An employee of the Rankin company opened the drums at the airport, mixed the insecticide with water and placed it in the airplane which was used to spray plaintiffs' cotton. Crop damage was noticed shortly thereafter, the plants grew abnormally, and production was adversely affected.

Three experts who examined the field testified that the cotton was damaged by a plant hormone known as 2,4-D which is used as a weed killer and has an adverse effect on

cotton, even in extremely small quantities. An inspector for the Department of Agriculture of the State of California took samples from the five open drums used in the spraying operation and from two unopened drums of the same product at the warehouse of the cooperative. The samples were sent to Sacramento for testing, and officials for the department reported that several tests showed "some evidence" of the presence of a small amount of 2,4-D or 2,4,5-T, a similar substance, in the five open drums and in the two unopened ones. The entomologist of the Bureau of Chemistry of the department stated that the weed killer was present in an amount toxic to bean sprouts, and another expert testified that cotton is more sensitive to this substance than bean sprouts.

Sherwin Williams, the cooperative, the Rankin company and various individuals employed by these companies were joined in a single action charging negligence in the manufacturing, selling and using of the Sherwin Williams' solution. The complaint also alleged breach of warranty by Sherwin Williams and the cooperative. The jury found against Sherwin Williams and in favor of the other defendants. Sherwin Williams alone appeals from the judgment and contends that no instructions should have been given on res ipsa loquitur and that those given on that doctrine and on implied warranties were erroneous.

## I. Res Ipsa Loquitur Instructions

The evidence is clearly sufficient to satisfy the requirement of the doctrine of res ipsa loquitur that the accident must be of such a nature that it probably was the result of negligence by someone, since it may be assumed that an insecticide such as the product involved here, which is designed for use on plants, will not ordinarily damage cotton crops if it is properly manufactured and applied. The evidence also meets the requirement that it must appear that the defendant is probably the one who is responsible. The fact that an accident occurs after the defendant relinquishes control of the instrumentality which causes the accident does not preclude application of the doctrine provided there is evidence that the instrumentality had not been improperly handled or its condition otherwise changed after control was relinquished by the defendant. (*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 444 [247 P.2d 344].) In the present case the codefendants are the only persons likely to

have been responsible for any alteration of the insecticide after the sealed drums were delivered by Sherwin Williams to the cooperative, and these defendants gave explanations of their activities which would indicate that they had not mishandled or improperly changed the condition of the spray which damaged plaintiffs' crop. Moreover, as we have seen, there is evidence that unopened drums of the insecticide in the warehouse of the cooperative also contained sufficient 2,4-D to injure cotton plants. ■ Under all the circumstances the evidence warrants the conclusion that the damage to the crop was probably due to some negligent conduct on the part of Sherwin Williams in allowing its product to become contaminated or in failing to discover the contamination before it relinquished control of the product. The trial court, therefore, was justified in giving instructions on the doctrine.

■ The procedural effect of res ipsa loquitur is presented by the contention that the court erred in telling the jurors that the inference of negligence based upon the doctrine is mandatory rather than permissive. They were instructed that from the occurrence of the damage involved in this case, as established by the evidence, "there arises an inference" of negligence by the defendants and that it is "incumbent upon the defendants to rebut the inference." ■ It is settled, of course, that res ipsa loquitur raises an inference, not a presumption, and the general rule is that whether a particular inference shall be drawn is a question of fact for the jury, even in the absence of evidence to the contrary. (See Code Civ. Proc., § 1958*; *Blank* v. *Coffin,* 20 Cal.2d 457, 461 [126 P.2d 868]; *Hamilton* v. *Pacific Elec. Ry. Co.,* 12 Cal.2d 598, 602-603 [86 P.2d 829].) ■ This, however, does not preclude the conclusion that res ipsa loquitur may give rise to a special kind of inference which the defendant must rebut, although the effect of the inference is somewhat akin to that of a presumption. (*Hardin* v. *San Jose City Lines,* 41 Cal.2d 432, 435 et seq. [260 P.2d 63], and cases there cited; see Code Civ. Proc., § 1959.†)

The Hardin case held that an instruction similar to the one involved here was properly given in an action against a com-

---

*Section 1958 of the Code of Civil Procedure provides, "An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect."

†Section 1959 of the Code of Civil Procedure provides, "A presumption is a deduction which the law expressly directs to be made from particular facts."

mon carrier for injuries received by a passenger and that the carrier was obliged to meet the res ipsa loquitur inference by evidence sufficient to offset or balance it. (41 Cal.2d at p. 435 et seq.) A similar burden has been placed upon defendants in other cases where there were special relationships between the parties. (*Dierman* v. *Providence Hospital*, 31 Cal.2d 290, 295-296 [188 P.2d 12] [medical patient]; *Ales* v. *Ryan*, 8 Cal.2d 82, 106 [64 P.2d 409] [medical patient]; see *Ybarra* v. *Spangard*, 25 Cal.2d 486, 490, 492, 494 [154 P.2d 687, 162 A.L.R. 1258] [medical patient]; *cf. George* v. *Bekins Van & Storage Co.*, 33 Cal.2d 834, 839-841 [205 P.2d 1037] [bailment].) It has also been held that the defendant must show that he was not at fault where the plaintiff was injured as a result of a dangerous activity in which the defendant was engaged and as to which the defendant was required to exercise great care. (See *Chutuk* v. *Southern Calif. Gas Co.*, 218 Cal. 395, 398-400 [23 P.2d 285] [furnishing gas]; *Damgaard* v. *Oakland High School Dist.*, 212 Cal. 316, 318-324 [298 P. 983] [dangerous chemical experiment]; *Bergen* v. *Tulare County Power Co.*, 173 Cal. 709, 719-721 [161 P. 269] [furnishing electricity]; *Diller* v. *Northern Cal. Power Co.*, 162 Cal. 531, 536-537 [123 P. 359, Ann.Cas. 1913D 908] [furnishing electricity]; *Ficken* v. *Jones* (1865), 28 Cal. 618, 625-628 [driving cattle through city]; *Junge* v. *Midland Counties etc. Corp.*, 38 Cal.App.2d 154, 157, 159 [100 P.2d 1073] [furnishing electricity]; *Harmon* v. *San Joaquin L. & P. Corp.*, 37 Cal.App.2d 169, 175 [98 P.2d 1064] [furnishing electricity].)

In some types of situations, because of the nature of the particular accident, an inference of negligence upon the part of the defendant may be so strong that no reasonable man could fail to accept it in the absence of explanatory evidence. (See *Alabama & V. Ry. Co.* v. *Groome*, 97 Miss. 201 [52 So. 703, 704]; *Angerman Co.* v. *Edgemon*, 76 Utah 394 [290 P. 169, 171, 79 A.L.R. 40]; *Pillars* v. *R. J. Reynolds Tobacco Co.*, 117 Miss. 490 [78 So. 365, 366]; Prosser on Torts [1941], 304.) Facts of this character appear to have been presented in *Ales* v. *Ryan*, 8 Cal.2d 82 [64 P.2d 409], where there was evidence that the defendant surgeon closed an incision without having removed a sponge. (See also cases collected in Prosser, *Res Ipsa Loquitur in California* [1949], 37 Cal.L.Rev. 183, 220-221.) Another basis for imposing the burden of explanation on the defendant in res ipsa loquitur

cases has been that the facts are peculiarly within his knowledge. (*Dierman* v. *Providence Hospital,* 31 Cal.2d 290, 295-296 [188 P.2d 12] [failure to produce in evidence a tank of anesthetizing gas where possible cause of injury to plaintiff was that the gas was contaminated] ; *Druzanich* v. *Criley,* 19 Cal.2d 439, 444-445 [122 P.2d 53] [failure of driver to explain what happened in automobile accident which occurred when automobile left road while plaintiff passenger was dozing].)

In a number of cases, which are difficult to classify, the courts, without discussion of the problem involved here, have either sustained instructions similar to the one given in the present case or have stated as a part of the rule that it is incumbent upon the defendant to show that he was not negligent. (See *Hinds* v. *Wheadon,* 19 Cal.2d 458, 461 [121 P.2d 724] [explosion of tank] ; *Hinds* v. *Wheadon,* 67 Cal. App.2d 456, 460-464 [154 P.2d 720] [same case, subsequent opinion] ; *Kenney* v. *Antonetti,* 211 Cal. 336, 339-340 [295 P. 341] [straying horse] ; *Michener* v. *Hutton,* 203 Cal. 604, 606, 609-611 [265 P. 238, 59 A.L.R. 480] [falling object] ; *Sherrillo* v. *Stone & Webster Eng. Corp.,* 110 Cal.App.2d 785, 790-791 [244 P.2d 70] [defective scaffold] ; *Meyers* v. *G. W. Thomas Drayage etc. Co.,* 108 Cal.App.2d 529, 532-533 [239 P.2d 118] [falling object] ; *Welch* v. *Sears, Roebuck & Co.,* 96 Cal.App.2d 553, 558-561 [215 P.2d 796] [falling object] ; *Radisich* v. *Franco-Italian Packing Co.,* 68 Cal.App. 2d 825, 840-841 [158 P.2d 435] [defective winch].)

A few decisions have criticized instructions to the effect that res ipsa loquitur imposes a mandatory burden upon the defendant to rebut the inference of negligence and have apparently proceeded on the theory that the doctrine creates an inference which is enough to avoid a nonsuit but which the trier of fact may accept or reject as it sees fit, even though the defendant offers no evidence. (*Pruett* v. *Burr,* 118 Cal.App.2d 188, 195-196 [257 P.2d 690] [action arising from the same spraying operation involved in the present case but as a result of damage to cotton belonging to plaintiffs' neighbor] ; *Black* v. *Partridge,* 115 Cal.App.2d 639, 648-650 [252 P.2d 760] ; *Bazzoli* v. *Nance's Sanitarium, Inc.,* 109 Cal.App.2d 232, 239-241 [240 P.2d 672] ; *Albert* v. *McKay & Co.,* 53 Cal.App. 325, 329-330 [200 P. 83] ; cf. *Anderson* v. *I. M. Jameson Corp.,* 7 Cal.2d 60, 66-67 [59 P.2d 962].) This view, which is inconsistent with most of the California decisions, is very difficult to apply, and there are substantial

reasons why we should hold that in every type of res ipsa loquitur case the defendant should have the burden of meeting the inference of negligence.

It must now be regarded as settled that the requirement that the defendant rebut the inference of negligence is the rule with regard to the specific groups of cases noted above, which represent the great majority of the decisions in California relating to the question. Moreover, as a practical matter it will be much simpler, for both trial and appellate courts, to apply this rule uniformly to all situations where an inference of negligence is based upon res ipsa loquitur. Another result will be the elimination of much difficulty in the drawing of instructions which will adequately inform the jury of its duties. In the absence of such a uniform rule, the nature and extent of the burden of proof imposed upon the defendant might frequently depend upon how conflicting testimony is resolved, particularly in cases where there is a dispute as to which of the parties had a superior knowledge.

The doctrine, of course, does not apply at all unless it appears that there is a probability of negligence, and writers who support the view that the defendant should be required to rebut the inference of negligence point out that in res ipsa loquitur cases the defendant is almost always in a better position to explain what occurred. (See Harper on Torts [1933] 185; Cal. Jury Instructions, Civil, 1952 Pocket Part, 92; Carpenter, *The Doctrine of Res Ipsa Loquitur in California*, 10 So.Cal.L.Rev. 166, 181; Carpenter, *A Rejoinder to Professor Prosser*, 10 So.Cal.L.Rev. 467, 470.) Accordingly, it is not unfair to require him to explain his conduct.

It is our conclusion that in all res ipsa loquitur situations the defendant must present evidence sufficient to meet or balance the inference of negligence, and that the jurors should be instructed that, if the defendant fails to do so, they should find for the plaintiff. The trial court, therefore, did not err in giving instructions that it was incumbent upon Sherwin Williams to rebut the inference of negligence.

The instructions given, however, were erroneous in that, while they purported to state all the conditions under which res ipsa loquitur would be applicable, they did not inform the jury that plaintiffs must show that the instrumentality which caused the damage was not mishandled or its condition otherwise changed after control was relinquished

by the person against whom the doctrine is to be applied. In giving instructions which define res ipsa loquitur it is ordinarily necessary to cover this problem where, as here, there is evidence that several persons had control of the instrumentality at different times before the accident. (*Black* v. *Partridge*, 115 Cal.App.2d 639, 650 [252 P.2d 760] ; *Zentz* v. *Coca Cola Bottling Co.*, 92 Cal.App.2d 130, 133 [206 P.2d 653] ; see *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514, 519-520 [203 P.2d 522].) Under the circumstances of the present case it was error to give the instructions which set forth the doctrine without mentioning plaintiffs' burden regarding the possibility that third persons may have been responsible for what happened.

## II. Warranty Instructions

The trial court instructed the jury in the language of subdivisions (1) and (2) of section 1735 of the Civil Code* relating to the implied warranties of fitness of purpose and merchantable quality. The jurors were also told that, if there was an implied warranty under this section, there was no requirement of privity of contract between the manufacturer and the ultimate consumer, and the manufacturer would be liable, regardless of negligence, for the damage caused by any breach of this warranty.† Sherwin Williams contends that the instructions are erroneous because, it asserts, (1) it is not liable for breach of warranty in view of the fact that it had made a disclaimer of warranty in labels which

---

*Section 1735 of the Civil Code reads in part as follows: "Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular .purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. ·

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality. . . ."

†The instruction read: "If you decide that any of the provisions of the code section which I have just read to you are applicable, and further decide that an implied warranty was made by the manufacturer, that warranty runs with the goods to the ultimate consumer, there being no requirement of privity of contract between the ultimate consumer and the manufacturer. And if you further find that the manufacturer breached such warranty, then it is liable for the damage caused by such breach, regardless of negligence."

were placed on the drums of insecticide, and (2) privity of contract is essential to liability for breach of warranty.

The labels which contained the disclaimer stated, "DDTOL 25% Emulsifiable is a solution of DDT in xylene which can be used on plants when it is mixed according to directions . . .." After giving mixing directions and recommendations for use on various products, such as potatoes, seed alfalfa and clover, onions, and other truck crops, but without mentioning cotton plants, the labels set forth the following chemical analysis:

```
"Active Ingredients:
 Dichloro diphenyl trichloroethane
 (DDT setting point 89° C. Minimum)... 25.0%
 Xylene .............................. 65.0%
Inert Ingredients: ..................... 10.0%
 _____
 Total .............................. 100.0%"
```

Certain cautionary instructions were given, and the label concluded with the statement, "Seller makes no warranty of any kind, express or implied, concerning the use of this product. Buyer assumes all risk in use or handling, whether in accordance with directions or not."

The statutory implied warranties of quality can, of course, be disclaimed by the seller, provided the buyer has knowledge or is chargeable with notice of the disclaimer before the bargain is complete. (Civ. Code, § 1791; *Miller v. Germain Seed etc. Co.,* 193 Cal. 62 [222 P. 817, 32 A.L.R. 1215]; *Sutter v. Associated Seed Growers, Inc.,* 31 Cal.App. 2d 543-547 [88 P.2d 144]; *Couts v. Sperry Flour Co.,* 85 Cal.App. 156 [259 P. 108]; see Prosser, *Warranty of Merchantable Quality,* 27 Minn.L.Rev. 117, 157-160.) Notice of disclaimer can be conveyed to the buyer by means of printed notices on letterheads, labels and the like. (*C. Lomori & Son v. Globe Laboratories,* 35 Cal.App.2d 248, 256 [95 P.2d 173]; *William A. Davis Co. v. Bertrand Seed Co.,* 94 Cal.App. 281 [271 P. 123]; see 1 Williston on Sales [rev.ed. 1948] 631.) Although plaintiffs themselves did not see the drums prior to the time their cotton crop was sprayed, they are chargeable with notice of the contents of the labels because the persons to whom the insecticide was delivered were obviously their agents for purposes of the spraying operation.

In determining whether an effective disclaimer of the statutory warranties has been made, we must look to the

label as a whole, and the general rule is that a disclaimer is to be strictly construed against the seller. (See Prosser, *Warranty of Merchantable Quality*, 27 Minn.L.Rev. 117, 160; 77 C.J.S. 1151.) The language of the Sherwin Williams disclaimer, when so construed, is sufficient to exclude the implied warranty contained in subdivision (1) of section 1735 of the Civil Code that the goods shall be reasonably fit for the purchaser's particular purpose. Plaintiffs' particular purpose was to use the spray as an insecticide on cotton plants, but the disclaimer expressly negatives any warranty concerning "use," and nowhere does the label state that the product was suitable for cotton plants. Although there is evidence that the cooperative acted as consignee-agent of Sherwin Williams for the purpose of selling the spray and might therefore have authority to make representations which would counteract the disclaimer, there is no contention that any such representations were made. It follows that instructing the jury in the terms of this subdivision of section 1735 was error.

The next question is whether the label excludes the implied warranty of "merchantable quality" which arises under subdivision (2) of section 1735 of the Civil Code where goods are bought by description. Many definitions of "merchantable quality" have been given, but all of them include the basic proposition that the quoted words refer to goods which are reasonably suitable for the ordinary uses and purposes of goods of the general type described by the terms of the sale and which are capable of passing in the market under the name or description by which they were sold. (See *Kenney v. Grogan*, 17 Cal.App. 527, 533 [120 P. 433]; 1 Williston on Sales [rev.ed. 1948] § 243, pp. 641-643; Prosser, *Warranty of Merchantable Quality*, 27 Minn.L.Rev. 117, 125-139; 46 Am.Jur. 526-527; 77 C.J.S. 1184-1185.) Hence it seems clear that the statutory warranty is sufficiently broad to impose liability, in the absence of disclaimer, if the goods contain an impurity of such a nature as to render them unusable, and therefore unsalable, for the general uses and purposes of goods of the kind described. The parties do not discuss, but apparently assume, that the presence of 2,4-D weed killer in the DDT spray ordered by plaintiffs would, without the asserted disclaimer, amount to a breach of the implied warranty of merchantable quality.

 Keeping in mind the rule noted above that a disclaimer is to be strictly construed against the seller, we con-

clude that the Sherwin Williams disclaimer is insufficient to exclude the implied warranty of merchantable quality. The label, after describing the product and listing the ingredients, states merely that there is no warranty as to "the use of this product" and that the buyer "assumes all risk in use." The description of the product on the label is in accord with the description of the spray which was ordered by plaintiffs, and the language of the disclaimer, when properly interpreted, is limited to a denial of any warranty that a substance which meets this description is an effective or safe insecticide. The language does not purport to disclaim the implied warranty that the substance in the drums actually meets the description of the product ordered by plaintiffs so as to be generally salable in the same manner as other products of the type described. More specifically, there is nothing in the disclaimer which suggests that Sherwin Williams was refusing to warrant that the liquid in the drums was compounded so as to conform with the description and was free from any impurity which would make it unsalable for the general purposes of a product of the kind ordered by plaintiffs. Accordingly, the trial court did not err in giving an instruction upon the implied warranty of merchantable quality.

We shall now consider whether the court erred in instructing the jury that an implied warranty under subdivision (1) or (2) of section 1735 of the Civil Code "runs with the goods to the ultimate consumer, there being no requirement of privity of contract between the ultimate consumer and the manufacturer." The general rule is that privity of contract is required in an action for breach of either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale. (See *Lewis* v. *Terry*, 111 Cal. 39, 44 [43 P. 398, 52 Am.St.Rep. 146, 31 L.R.A. 220]; *Cliff* v. *California Spray Chemical Co.*, 83 Cal.App. 424, 430 [257 P. 99]; 1 Williston on Sales [rev.ed. 1948] § 244, pp. 645-648; 46 Am.Jur. 489-490; 17 A.L.R. 672, 709; 140 A.L.R. 192, 249-250.) In this state an exception to the requirement of privity has been made in cases involving foodstuffs, where it is held that an implied warranty of fitness for human consumption runs from the manufacturer to the ultimate consumer regardless of privity of contract. (*Klein* v. *Duchess Sandwich Co., Ltd.*, 14 Cal.2d 272 [93 P.2d 799]; *Vaccarezza* v. *Sanguinetti*, 71 Cal.App.2d 687, 689 [163 P.2d 470].)

Another possible exception to the general rule is found in a few cases where the purchaser of a product relied on representations made by the manufacturer in labels or advertising material, and recovery from the manufacturer was allowed on the theory of express warranty without a showing of privity. (See *Free* v. *Sluss,* 87 Cal.App.2d Supp. 933, 936-937 [197 P.2d 854] [soap package contained printed guarantee of quality]; *Bahlman* v. *Hudson Motor Car Co.,* 290 Mich. 683 [288 N.W. 309, 312-313] [automobile manufacturer represented top of car to be made of seamless steel]; *Baxter* v. *Ford Motor Co.,* 168 Wash. 456 [12 P.2d 409, 15 P.2d 1118, 88 A.L.R. 521] [automobile manufacturer represented windshield to be nonshatterable glass]; *Simpson* v. *American Oil Co.,* 217 N.C. 542 [8 S.E.2d 813, 815-816] [representation on label that insecticide was nonpoisonous to humans]; Prosser on Torts [1941] 688-693; 1 Williston on Sales [rev. ed. 1948] 648-650; Feezer, *"Manufacturer's Liability for Injuries Caused by His Product,"* 37 Mich.L.Rev. 1; Jeanblanc, *"Manufacturer's Liability to Persons Other than Their Immediate Vendees,"* 24 Va.L.Rev. 134, 146-155.) Neither exception is applicable here. ■ The facts of the present case do not come within the exception relating to foodstuffs, and the other exception, where representations are made by means of labels or advertisements, is applicable only to express warranties. As we have seen, the instruction involved here dealt only with implied warranties. Accordingly, it was error for the trial court to instruct that privity was not required.

The question whether plaintiffs could recover because of breach of an express warranty was apparently not presented to the jury, but, since there may be a new trial, it is appropriate to point out that the record contains sufficient evidence to show that there were representations which could form the basis of an express warranty. ■ The principal elements of an express warranty are an affirmation of fact or promise by the seller and reliance thereon by the buyer. (Civ. Code, § 1732.*) ■ As we have seen, the labels on the drums gave a chemical analysis of the contents which purported to list all of the active ingredients, totalling 90 per

---

*Section 1732 of the Civil Code defines express warranty as follows: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. . . ."

cent, and designated the remaining 10 per cent as "inert ingredients." This analysis is in effect a representation that the ingredients listed were the only active ones contained in the spray, and, if the other necessary requirements were established, the label would amount to an express warranty which would be breached by the presence of the unlisted 2,4-D weed killer. (*Cf.* 1 Williston on Sales [rev.ed. 1948], 527-533.) ▆▆▆ An express warranty of the chemical content of the spray, of course, is not excluded by the disclaimer, which relates only to use. We need not consider at this time whether plaintiffs can show reliance by themselves or their agents upon the statements on the label or whether they can establish that there was privity between themselves and Sherwin Williams or that they come within some exception to the rule.

### CONCLUSION

▆▆▆ The trial court erred in its instructions (1) by purporting to define res ipsa loquitur without including an essential condition, (2) by stating that privity was not required in order to find that Sherwin Williams was bound by the statutory implied warranties, and (3) by stating that recovery might be based upon an implied warranty of fitness for a particular purpose. The errors in the instructions relate to essential matters, and it is our conclusion that under all the circumstances there has been a miscarriage of justice.

The judgment is reversed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.