[Civ. No. 159.   Fifth Dist.   June 19, 1963.]

BESSIE GERHARDT et al., Plaintiffs and Appellants, v. FRESNO MEDICAL GROUP et al., Defendants and Respondents.

Jack Miller, William H. Lally and James D. Rohde for Plaintiffs and Appellants.

Stammer, McKnight & Barnum and James K. Barnum for Defendants and Respondents.

STONE, Acting P. J.—This is an appeal from a judgment entered pursuant to a jury verdict for defendants, in a malpractice action. Plaintiffs-appellants are husband and wife, their interests are identical insofar as this appeal is concerned, and for convenience Bessie Gerhardt, the patient, is hereinafter referred to as "plaintiff." The thirteen defendants-respondents are doctors and members of the Fresno Medical Group, an unincorporated association.

A general check-up of plaintiff by defendant Tillotson revealed a cancerous cervix, and a hysterectomy was recommended. As early as 1944 plaintiff had been aware of a lymph node located in the posterior triangle of the right side of her neck. Although it had caused her no difficulty, it was recom-

mended that at the time of the hysterectomy the node be removed to determine whether the cancer had spread into this area. In a Fresno hospital, defendant Tieche performed the hysterectomy, assisted by defendant Tuschka. While plaintiff was still under the anesthetic, Dr. Tuschka, a general surgeon, unassisted removed the lymph node.

The hysterectomy was successful, and the lymph node was benign. However, while plaintiff was still hospitalized she had difficulty in moving her right arm and shoulder, and movement was accompanied by pain. The shoulder operation was performed December 5, 1960. On January 20, 1961, plaintiff was examined by defendants Tieche and Tillotson, who diagnosed her difficulty as possible bursitis and referred her to defendant Reiner, an orthopedic surgeon. Dr. Reiner discovered that plaintiff had a paralyzed trapezius muscle, and concluded the cause was damage to the spinal accessory nerve which innervates the trapezius muscle. This nerve originates in the brain, courses down the spinal column, across the jugular vein, and then branches. We are concerned with the branch that leads to the trapezius muscle. In the area of the operation the nerve travels through fatty tissue beneath the lymph node.

Defendant Tuschka told plaintiff that he believed he had injured the spinal accessory nerve during surgery, and referred her to a neurosurgeon, Dr. Pace, who, though not a member of defendant Fresno Medical Group, handled cases for them within his special field. After an examination, Dr. Pace concluded that plaintiff's condition was the result of an injury to the spinal accessory nerve. He recommended an exploratory operation to determine the nature and the extent of damage.

Plaintiff decided to have an examination by a doctor in no way connected with the Fresno Medical Group. She consulted a Dr. Washburn of San Francisco, who also recommended an exploratory operation.

Plaintiff elected to have Dr. Washburn perform the operation. He made an incision above the site of the prior operation and traced the nerve to the trapezius muscle. The following observations by Dr. Washburn are not disputed: The nerve was located in its normal position approximately 1½ to 2 centimeters from the outside of the skin; it was lying below the scar tissue from the previous operation and was not involved in excessive scar tissue, that is, no scar tissue was

pinching the nerve and causing the malfunction; the nerve had not been severed; a section of the nerve had been crushed.

Defendant Tuschka testified that in his opinion the nerve had been crushed during the surgery which he performed, and that the crushing had been done by a hemostat, a clamping device, which he had used.

In describing the operation Dr. Tuschka testified that he made a 1½ to 2-inch incision to expose the node, that he grasped it with tweezers, pulled it up, and dissected the node from the floor of the wound by use of a blunt dissecting instrument. The floor of the wound was not visible until the node was separated, whereupon the underlying mass of fatty tissue became visible. The doctor also testified that he knew the nerve was in the fatty tissue, but that he did not see it. He said that he was operating in a bloodless field, that his procedure was to cut, sponge the area, catch the bleeders with a hemostat and tie the bleeding vessel, then cut again, repeating the procedure. He testified, also, that during the operation the vessels themselves are frequently unseen, since they bleed from points within the tissue, and under such circumstances clamps are applied at the points of bleeding. He emphasized that blood vessels in fatty tissue don't stick up in the open so they can be seen and clamped.

Although plaintiff appeals on the sole ground of insufficiency of the evidence to support the verdict, the question has three facets. As delineated by defendants they are: *One,* is the doctrine of res ipsa loquitur applicable in the light of *Siverson* v. *Weber,* 57 Cal.2d 834 [22 Cal.Rptr. 337, 372 P.2d 97], which was decided subsequent to the trial of this action? *Two,* aside from the rule of *Siverson,* is the doctrine of res ipsa loquitur applicable? *Three,* did defendants present evidence of a substantial nature to meet the inference of defendant Tuschka's negligence raised by the doctrine of res ipsa loquitur?

*One.* Is the doctrine of res ipsa loquitur applicable under the rule of *Siverson* v. *Weber, supra*? Defendants argue that the evidence proved only that the unfortunate result of the operation here suffered by plaintiff rarely occurs, and therefore the rule of *Siverson* precludes application of the res ipsa loquitur doctrine. It is true that in *Siverson* the Supreme Court said, at page 839, "To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a bur-

den upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used.''

However, this conclusion must be construed in the light of the facts related in the opinion. The Supreme Court observed in *Siverson* that the medical witnesses agreed that the exact cause of a fistula's appearing several days after a hysterectomy cannot ordinarily be ascertained, and that the cause of the particular fistula there involved could not be determined from the evidence. A number of possible causes were cited, but there was nothing to indicate that the fistula was caused by any of them, or a combination of them. As Chief Justice Gibson, speaking for the court, said in *Davis* v. *Memorial Hospital*, 58 Cal.2d 815 [26 Cal.Rptr. 633, 376 P.2d 561], at pages 817-818: ''The case of *Siverson* v. *Weber, supra,* 57 Cal. 2d 834, 836-838, is readily distinguishable since it involved a medical matter of far greater complexity than an enema, namely, a hysterectomy, one of the inherent risks of which, according to all the expert testimony, was the occurrence of a fistula.''

In contrast to the *Siverson* case, the medical testimony in the case before us disclosed three possible causes of the result suffered by plaintiff, two of which were eliminated by Dr. Tuschka himself. He testified that one of them, cancerous involvement requiring intentional sacrificing of the nerve, was not a factor; and that a second possible cause, injury from dissecting out, that is, intentionally exposing or laying the nerve open, did not occur as that procedure was not used in the operation. The third and exact cause of the nerve injury was determined: crushing of the spinal accessory nerve by a hemostat used to clamp off bleeding blood vessels in the area during the lymph node operation.

Twelve doctors, including defendant Tuschka, testified directly or by way of deposition, that a lymph node removal is a relatively simple operation. Only one of the twelve doctors had heard or read of a similar result, and he had heard of just one similar case.

To summarize, we have here an unfortunate result that is extremely rare, a result that was not shown to be an inherent risk of the operation if due care is used, together with undisputed testimony that the nerve was crushed by a hemostat used during the operation. Thus we have a nexus between

the extremely rare result and the cause of that result, a nexus which was lacking in *Siverson* v. *Weber, supra.*

However, the foregoing discussion does not completely dispose of defendants' contentions concerning the import of *Siverson.* If we understand their argument aright, they contend also that evidence that an unfortunate result rarely occurs cannot be considered in determining whether such result is an inherent risk of the operation. We do not believe *Siverson* is subject to such an interpretation. In the first place, medical experts in *Siverson* testified that the possibility of a fistula's developing is an inherent risk in any hysterectomy. The Supreme Court cited *Dees* v. *Pace*, 118 Cal.App.2d 284, 289 [257 P.2d 756], holding that "a fistula is a recognized hazard in all hysterectomies, one of the calculated risks." In the case before us no doctor testified that a crushed spinal accessory nerve is an inherent risk or hazard of a lymph node removal.

Aside from the factual dissimilarity as to inherent risk between *Siverson* and the instant case, it would seem anomalous to hold that proof that a result has rarely occurred in a particular operation has no bearing upon whether that result is "an inherent risk" of the operation. The concept "risk" stems largely from empirical knowledge. One of the more common ways of determining whether a given undertaking entails a particular risk and, if so, the probability of occurrence, is by experiential evaluation. The word "inherent" according to Webster's Third New International Dictionary, unabridged, is defined as "structural or involved in the constitution or essential character of something: belonging by nature or settled habit: intrinsic, essential."

With this in mind, we turn to the testimony of the twelve doctors in this case, and find that just one doctor had heard of a similar result, and he had heard of only one. The combined experience of the doctors, one of whom had practiced for over 30 years, covered hundreds of similar operations. Since none had even read of such an unfortunate occurrence, their testimony well may have expressed the result of thousands of similar operations. In these circumstances it would seem contradictory to hold that an extremely rare result has no probative value in determining whether that result is an inherent, intrinsic or essential risk of the operation. Although one doctor testified that some risk accompanies every operation, that truism does not answer the question before us. The issue here is whether the particular result, the crushing of the

spinal accessory nerve, is an inherent risk of a lymph node removal.

■ As we understand the rule of *Siverson*, it limits the application of the doctrine of res ipsa loquitur in the absence of a causal nexus between the unfortunate result and an act of the doctor. ■ No inference of negligence arises solely because the result of the operation is something that rarely occurs. But the issue of inherent risk is subsidiary to the ultimate inference of negligence. Evidence that a result rarely occurs may be considered in determining this subsidiary issue; that is to say, it is evidence to be weighed against contrary evidence on the issue. ■ In this case, there was no medical testimony that a crushed spinal accessory nerve is a calculated risk inherent in a lymph node removal. In the absence of contrary evidence, circumstantial evidence derived from the undisputed testimony that in a lymph node removal the unfortunate result here obtained is extremely rare, is determinative.

■ *Two.* Aside from the rule of *Siverson*, did the evidence justify an inference of negligence under the doctrine of res ipsa loquitur which defendants were required to meet? In addition to the evidence heretofore discussed which is relevant to this issue, defendant Tuschka testified, in part:

"Q. Now Doctor, you said here that it is your opinion that what happened was that when you were clamping off these blood vessels, you got part of the accessory nerve in an instrument such as this, is that correct?

A. Yes, sir.

Q. And I take it, Doctor, before you grab any tissue, you want to make very sure of what you are grabbing?

A. Yes, sir.

Q. I take it, Doctor, that before you would grab any tissue, you would have a clean field and would look at what you were doing?

A. Yes, sir.

Q. And Doctor, that I think it has been described, that nerve is the size of a piece of laundry string, more or less?

A. Yes, sir.

"        .    .    .    .    .    .    .    .    .    .    .    .

"Q. Now Doctor, as you said before, at all times you knew that you were working in the field of the spinal accessory nerve?

A. Yes.

Q. You knew that was in the operative field?

A. Yes, sir.

Q. You knew that you were going to do blunt dissection?

A. Yes, sir.

Q. You knew that you were going to do sharp dissection?

A. Yes, sir.

Q. You knew all these things? You knew where the spinal accessory nerve lay?

A. Yes, sir.

Q. You also knew that this woman had no unanatomical patterns such as already testified to?

A. Yes, sir.

Q. That everything was normal, is that correct?

A. That is correct.

Q. And Doctor, you knew when you put this clamp on, or hemostat of this type, you knew that if you misjudged by just a millimeter or two, you could grab the nerve, correct?

A. Yes, sir.

Q. And that is what caused this lady to have this shoulder, right?

A. Yes, sir.''

The evidence which established the cause of the injury, coupled with the testimony of the twelve doctors that the operation is relatively simple, the fact that only one witness had ever heard of one similar unfortunate result, and the absence of direct evidence that the result was an inherent risk of the operation, combine to bring the case within the rationale of the res ipsa loquitur doctrine. To paraphrase the concluding sentence of *Siverson* v. *Weber, supra,* pages 839-840, in light of the evidence adduced it can be said that the injury to the spinal accessory nerve was more probably than not the result of the negligence of Dr. Tuschka. (See also *Di Mare* v. *Cresci,* 58 Cal.2d 292, 298 [23 Cal.Rptr. 772, 373 P.2d 860].)

The inference of negligence in plaintiff's favor, which thus arose under the doctrine of res ipsa loquitur, required defendants to explain why or how the nerve was clamped. (*Burr* v. *Sherwin Williams Co.,* 42 Cal.2d 682, 688 [268 P.2d 1041]; *Hardin* v. *San Jose City Lines, Inc.,* 41 Cal.2d 432, 436 [260 P.2d 63]; *Dierman* v. *Providence Hospital,* 31 Cal.2d 290, 292 [188 P.2d 12]; *Kohl* v. *Disneyland, Inc.,* 201 Cal.App.2d 780, 783 [20 Cal.Rptr. 367].) The burden of going forward with substantial evidence to dispel or equally balance the inference of negligence rested on defendants. (*Danner* v. *Atkins,* 47 Cal.2d 327, 332 [303 P.2d 724]; *Burr* v. *Sherwin Williams*

*Co., supra,* p. 690; *Hardin* v. *San Jose City Lines, Inc., supra,* p. 437; *Scott* v. *Burke,* 39 Cal.2d 388, 399 [257 P.2d 313]; *Schoenbach* v. *Key System Transit Lines,* 168 Cal.App. 2d 302, 308 [335 P.2d 725]; *Kohl* v. *Disneyland, supra.*)

Defendants argue that the jury may have rejected the doctrine of res ipsa loquitur. ██ However, when the facts giving rise to the doctrine are undisputed, as here, the inference of negligence arises as a matter of law. (*Di Mare* v. *Cresci, supra,* p. 300; *Burr* v. *Sherwin Williams Co., supra,* p. 691.)

██ The inference of negligence created by the rule of res ipsa loquitur is in itself evidence. In *Ales* v. *Ryan,* 8 Cal.2d 82 [64 P.2d 409], the Supreme Court had this to say, at page 99: "The rule is well settled by a multitude of decisions of the appellate courts of this state to the effect that the inference of negligence which is created by the rule *res ipsa loquitur* is in itself evidence which may not be disregarded by the jury and which in the absence of any other evidence as to negligence, necessitates a verdict in favor of the plaintiff." (See also *Druzanich* v. *Criley,* 19 Cal.2d 439, 445 [122 P.2d 53].)

Thus under the doctrine of the *Ales* case, plaintiff was entitled to a verdict unless the evidence relied upon by defendants was adequate to meet or dispel the inference of negligence arising under the doctrine of res ipsa loquitur.

*Three.* The critical issue is thus narrowed to whether the evidence offered on behalf of defendant Tuschka to meet or dispel the inference of negligence was substantial.

The first question that naturally comes to mind is what constitutes substantial evidence? The term is difficult to define as an isolated concept because the evidence to be weighed as well as the issue which the evidence is professed to prove is always peculiar to the individual case. The United States Supreme Court has said that "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (*Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U.S. 197, 229 [59 S.Ct. 206, 217, 83 L.Ed. 126, 140].) California courts have approved the reasonable-mind standard in testing the sufficiency of evidence. For example, in the early case of *Houghton* v. *Loma Prieta Lumber Co.,* 152 Cal. 574 [93 P. 377], the Supreme Court, in discussing the term "substantial evidence" uses the test of whether the evidence would appeal to a fair and reasonable mind.

▮ Therefore the evidence which defendants point to as meeting or dispelling the inference of negligence, is to be tested according to whether a reasonable mind would accept it as probative of the issue. Specifically, does the evidence explain why or how defendant Tuschka crushed plaintiff's spinal accessory nerve with a hemostat?

In support of their contention that they presented substantial evidence to meet or dispel the inference of negligence, defendants rely quite largely upon the testimony of defendant Tuschka, Dr. Pace, and defendant Olson. In this connection, they quote the following testimony of Dr. Tuschka:

"Q. (Mr. Barnum) All right, now, Doctor. When you applied the hemostats to the bleeders in that area, were you looking to see what it was that you were clamping?

A. Yes, sir.

Q. Did you intentionally clamp the spinal accessory nerve?

A. No, sir.

Q. Now Doctor, the testimony which has come in and similarly the subsequent operation, you are now aware of the fact that an operation was performed upon Mrs. Gerhardt by Dr. Washburn in May, at which time he dissected the spinal nerve out, and looked at it for a distance of four or five centimeters, and that he stated that he found the condition of the nerve immediately under the old operative scar to be such that a three to four millimeter portion of the nerve appeared to be crushed?

A. Yes, sir.

Q. And as if by a hemostat or a blunt instrument?

A. Yes, sir.

Q. All right, now, Doctor, is it your opinion now with all of the evidence that you have received, including this information concerning the latest surgery, is it your opinion that during the course of this surgery there was a hemostat placed by you in some portion, a portion of it upon this nerve?

A. Yes, sir.

Q. All right now, if it is true as you have stated that you were operating in as bloodless a field as possible, that you could visualize all structures within the wound, and that you did not intentionally clamp the nerve, and that you looked where you were putting the clamp, but notwithstanding all of this if it now develops that you did in fact place a hemostat upon the nerve, what in your opinion is an explanation as to how this happened?

A. Well, I believe sir that, well, I know that there is bleed-

ing which also occurred in the fat around the lymph node, as you remove it, and here again you do as carefully as you can, as you do on the outside, sponging and grasping the bleeding area with a hemostat. Now as I say, these blood vessels don't stick up in the air so that you can see them and grab them. They are a bleeding point in the fatty tissue itself, so that the hemostat is applied at the bleeding point, and I—from the evidence which has been presented to me—I suspect the hemostat was applied in this manner and the nerve or a portion of the nerve was caught in the clamp.

Q. Now, Doctor, when we speak of this explanation, what portion of the hemostat would actually contact the nerve?

A. The distal part, the point.

Q. The point?

A. Yes, sir.

Q. And when we speak of the explanation as you have done, what is the amount of distance or space that we are now talking about?

A. Oh, I would say it is a millimeter or two millimeters of tissue, would be grasped in the clamp.''

■ We are unable to agree with defendants that this testimony constitutes an explanation dispelling the inference that Dr. Tuschka was negligent in not knowing that he had clamped the spinal accessory nerve. In substance, his testimony is no more than a statement that ''the nerve was caught in the clamp.'' Had defendant Tuschka testified that the nerve was located in an unnatural position or that the surrounding area was peculiar to normal anatomical structures and this caused him to clamp the nerve unexpectedly when he clamped a blood vessel, or had he testified that excessive bleeding required an emergency clamping of a blood vessel with a calculated risk, such answers would have been explanatory and some evidence on the issue. But merely to say that in applying the hemostat at the bleeding point the nerve was caught in the clamp, a fact which Dr. Tuschka did not learn until several weeks after the operation, does not meet the inference of negligence raised by the doctrine of res ipsa loquitur. Rather than explaining why or how the nerve was clamped, it summarizes the basic evidence that makes the doctrine of res ipsa loquitur applicable.

Respondents also rely upon the testimony of Dr. Pace, the only doctor other than defendant Tuschka called as a defense witness. Although Dr. Pace testified at some length concern-

ing the operation, his only explanation for the unfortunate result was that surgery "is not an exact science by any means." This conclusion is not substantial evidence to explain the inference of negligence. Viewed in the light of the issue to be determined, it is a mere verbalism.

Defendant Olson, the third doctor whose testimony is referred to in defendants' brief, was not called as a defense witness, but plaintiff read his deposition into the record. The answer of defendant Olson upon which defendants rely assumes a fact contrary to the evidence: the removal of a swollen tumor, cyst or lymph node. Defendant Tuschka testified that the node he removed was slightly fixed in the lower portion, but otherwise freely movable, and that the operation involved no unusual circumstances.

Defendants cite evidence of defendant Tuschka's excellent qualifications, including education, training, experience and exemplary record as a practicing surgeon. This evidence, however, does not explain why the hemostat when clamped on a bleeding blood vessel was also clamped on the spinal accessory nerve, nor why Dr. Tuschka did not know that he had clamped the nerve.

The judgment is reversed.

Brown (R.M.), J., concurred.

Conley, P. J., deeming himself disqualified, did not participate.

Respondents' petition for a hearing by the Supreme Court was denied August 14, 1963. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.